Jonas H. WHITMORE, Petitioner,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Respondent.

No. PB–C–89–341.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Sept. 22, 1992.

---

*MEMORANDUM OPINION
AND ORDER*

SUSAN WEBBER WRIGHT, District
Judge.

Petitioner Jonas H. Whitmore, an inmate
in custody of the Arkansas Department of
Correction, is under sentence of death for the
1986 murder of Essie Mae Black. Petitioner
seeks a writ of habeas corpus pursuant to 28
U.S.C. § 2254 on grounds that both his con-
viction and sentence are in violation of vari-
ous provisions of the United States Constitu-
tion. Having carefully reviewed the record,[1]
the Court concludes each of the grounds
advanced by petitioner in support of his peti-

---

1. References to the record are designated as fol-
lows: trial transcript: "(Tr.)"; habeas hearing transcript: "(H.Tr.)"; and supplemental habeas hearing transcript: "(S.H.Tr.)."

tion for writ of habeas corpus is without merit.

### I.

On the afternoon of August 14, 1986, the body of sixty-two-year-old Essie Mae Black was found in the bedroom of her home in Mount Ida, Arkansas, lying between two beds (Tr. 770, 779). She had been stabbed at least ten times in her front and back, her throat had been cut, and an "X" had been carved into the right side of her face (Tr. 820, 910–11, 916, 919–20). It was determined that $150 was missing from Mrs. Black's purse (which was found with its contents spilled out on a bed next to the body) and that $126 was missing from a kitchen drawer (Tr. 838, 844–46). A knife and clothing belonging to petitioner were found in a wooded area stained with blood of the same type as Mrs. Black (Tr. 889–91, 927–29, 932, 946, 953, 968–69, 1111, 1121, 1141). The labels had been removed from the clothes but were found in the same general area (Tr. 889–90, 895).

Petitioner was arrested on September 23, 1986, in Roundup, Montana and returned to Arkansas where, after a change of venue to Scott County, he was tried on a charge of capital murder (Tr. 18, 196, 239, 459–63). At trial, petitioner testified that on August 14, 1986, he was in Mount Ida looking for property to rent or buy and that he stopped at the home of Mrs. Black to ask her if she knew of any cheap trailer houses or property to rent or own in the area (Tr. 1060–63, 1096–99). Not knowing of anything right off hand, Mrs. Black invited petitioner inside her home to see if she could be of any help (Tr. 1063). Once inside, Mrs. Black sat down at a kitchen table and asked petitioner to hand her a purse that was sitting on what he described as a "buffet counter top or china closet or something that looked like [an] old antique" (Tr. 1064). Petitioner handed Mrs. Black the purse and a wallet or checkbook that had fallen out, and asked permission to use the restroom (Tr. 1064–65). When he emerged from the restroom, Mrs. Black was in the hallway talking on the telephone in an attempt to provide him with the information he was seeking (Tr. 1064–65, 1100, 1102–03, 1105–08). Petitioner testified that Mrs. Black mentioned a newspaper, which he noticed lying on the floor in the bedroom, and that when he bent down to pick it up, he experienced a "flashback" of his mother[2] (Tr. 1066–69, 1107–09, 1116). Exactly what happened next is not clear, but petitioner remembers his hand was moving "up and down" as he was telling Mrs. Black "don't mom, don't," and remembers later walking to his car with blood all over him (Tr. 1070, 1114–17, 1143). He testified that when he left the residence, Mrs. Black was sitting on the bed "whimpering" (Tr. 1070, 1114–16, 1118, 1129). Petitioner drove down the highway and pulled off into a wooded area where he removed the labels from his clothes and discarded the clothes because they were bloody (Tr. 1120–21, 1124). He washed his hands and the knife he was carrying but threw the knife away when he was unable to remove the blood (Tr. 1123–24). He later threw his shoes away, and drove into the town of Hot Springs, Arkansas, where he purchased a "fancy card" for his wife and a carton of cigarettes with a one-hundred-dollar bill (Tr. 1130–31). He later purchased gas with another one-hundred-dollar bill[3] (Tr. 1132).

---

**2.** Petitioner had earlier testified that Mrs. Black resembled his deceased mother, so much so that she could have passed for his mother's twin sister (Tr. 1062–63). He explained that his mother and aunt had sexually abused him as a child and that certain events would trigger flashbacks of that abuse (Tr. 1066–69). Petitioner testified that he "felt bad ... inside" while in Mrs. Black's home, and that he was having flashbacks of his mother naked (Tr. 1062–64, 1116–17).

**3.** Petitioner's testimony at trial was generally consistent with a statement he made to officers who were transporting him back to Arkansas on the morning of September 26, 1986, and with

statements he made to officers on September 27, 1986, and September 28, 1986, while confined in the Montgomery County, Arkansas, jail (Tr. 1003–08, 1027–45). Each of these statements was admitted into evidence (Tr. 398–99, 1003–08, 1027–45). In the statement of September 28, 1986, which was taped and played to the jury, petitioner stated that he became dizzy after picking up the newspaper, and that when he turned around, "it was like [he] was looking at [his] mother and she was standing there strip naked" (Tr. 1031). He stated that Mrs. Black later took him into her bedroom, unzipped his pants, and started playing with [his] privates" (Tr. 1033). Petitioner remembers calling her mom and tell-

Petitioner was convicted of capital murder by a jury in the Scott County, Arkansas, Circuit Court and, following the penalty phase of his bifurcated trial, sentenced to death by lethal injection. The Arkansas Supreme Court affirmed his conviction and sentence on direct appeal, *Whitmore v. State*, 296 Ark. 308, 756 S.W.2d 890 (1988), and denied his request to proceed under Rule 37 of the Arkansas Rules of Criminal Procedure. *Whitmore v. State*, 299 Ark. 55, 771 S.W.2d 266 (1989).

The petition now before the Court was filed on June 28, 1989, and sets forth the following grounds for relief: (1) petitioner was denied effective assistance of counsel; (2) the Arkansas death penalty scheme is unconstitutional on its face and as applied; (3) improper admission of evidence at trial; and (4) petitioner is currently mentally incompetent and, thus, may not be executed.

## II.

■ As an initial matter, the Court notes that the factual findings of the state courts concerning the issues raised by petitioner shall be presumed to be correct pursuant to 28 U.S.C. § 2254(d).

> [T]he findings made by the state-court system "shall be presumed to be correct" unless one of seven conditions specifically set forth in § 2254(d) was found to exist by the federal habeas court. If none of those seven conditions were found to exist, or unless the *habeas* court concludes that the relevant state court determination is not "fairly supported by the record," "the burden shall rest upon the applicant to establish *by convincing evidence* that the factual determination by the state court was erroneous." (Emphasis supplied.)

*Sumner v. Mata*, 449 U.S. 539, 550, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981). Any rejection of the state court factual findings must be accompanied by a statement explaining the habeas court's reasoning, in terms of the conditions listed in § 2254(d). *Id.* at 551–552, 101 S.Ct. at 771–772. "A federal court must more than simply disagree with a state court before rejecting its factual determination. Rather, a federal court must conclude that a state court's findings lack 'even "fair support" in the record.'" *Woods v. Armontrout*, 787 F.2d 310, 313 (8th Cir.1986), *cert. denied*, 479 U.S. 1036, 107 S.Ct. 890, 93 L.Ed.2d 842 (1987). A federal court may not redetermine the credibility of witnesses when the state court's determination is fairly supported by the record. *Miller v. Fenton*, 474 U.S. 104, 114, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985). In addition, while a federal court must determine the ultimate legal question of the voluntariness of a confession, subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, are entitled to the § 2254(d) presumption of correctness. *Id.* at 117, 106 S.Ct. at 453.

Petitioner does not assert that any of the seven conditions listed in § 2254(d) are present in his case and the Court finds the factual determinations made by the state courts are fairly supported by the record. Thus, the presumption applies.

## III.

Petitioner first claims he received ineffective assistance of counsel at both the guilt and penalty phases of his trial.[4] This Court considers petitioner's claim of ineffective assistance of counsel under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner must show that "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct.

---

ing her "don't, don't do that," and that during this time, his left hand kept going up and down. *Id.* He stated that before he left the room, "she cried, then she said—I remember her saying okay, okay, and she fell on the floor, and I ran out, out the door, and I got in my car and I drove towards Hot Springs ..." (Tr. 1033–34). Petitioner stated that when Mrs. Black fell on the floor, he "didn't see nothing except a naked body" (Tr. 1038). He noted that when he later

purchased cigarettes, he pulled out of his pocket a wad of one-hundred-dollar bills and said to himself, "where in the hell did that money come from[?]" (Tr. 1035).

4. Petitioner was represented at trial and on direct appeal to the Arkansas Supreme Court by Gordon L. Humphrey, Jr., and Neal Kirkpatrick.

at 2064, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.[5] Unless petitioner makes both showings, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064. In assessing petitioner's claims of ineffective assistance of counsel, this Court's scrutiny of counsels' performance must be "highly deferential ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. at 2065.

> [T]he courts must resist the temptation to second-guess a lawyer's trial strategy; the lawyer makes choices based on the law as it appears at the time, the facts as disclosed in the proceedings to that point, and his best judgment as to the attitudes and sympathies of judge and jury. The fact that the choice later proves to have been unsound does not require a finding of ineffectiveness.
>
> The petitioner bears the burden of successfully challenging particular acts and omissions of his attorney which were not the result of reasonable professional judgment; it is not enough to complain after the fact that he lost, when in fact the strategy at trial may have been reasonable in the face of an unfavorable case.

*Blackmon v. White,* 825 F.2d 1263, 1265 (8th Cir.1987).

With these standards in mind, the Court will address in turn each of the claims of ineffective assistance of counsel.

### A.

■ Petitioner argues counsel were ineffective during the guilt phase of his trial for failing to object to the prosecution's reference to a previous forgery conviction (Tr.

1140) and for themselves eliciting testimony from him regarding a twenty-three-year-old conviction for attempted robbery (Tr. 1141). He argues such evidence could not have been introduced under Rule 609 of the Arkansas Rules of Evidence and could not have served any strategic goal. Petitioner's argument is without merit on both counts.

The Arkansas Supreme Court would not have been receptive to an objection to the forgery conviction since it concluded that such evidence was in fact admissible under Rule 609. *Whitmore v. State,* 299 Ark. at 64, 771 S.W.2d at 270. Even had the Court ruled otherwise, counsels' strategic decision not to object to the forgery conviction and "call[ ] the jury's attention to it even more than it had already been done because it kind of ended right there," was a reasonable one and should not be second-guessed by this Court (H.Tr. 65). While evidence of the attempted robbery conviction may not have been admissible for impeachment purposes in the guilt phase of the trial, it was admissible in the penalty phase to prove the aggravating circumstance found in Ark.Code Ann. § 5–4–604(3).[6] *Whitmore v. State,* 296 Ark. at 316, 756 S.W.2d at 893–95. That being the case, and considering the overwhelming evidence of guilt that had already been adduced against petitioner, counsel cannot be found ineffective for attempting to "deflate" and "blunt" the impact such a conviction could be expected to have in the penalty phase of the trial by having petitioner himself explain the circumstances surrounding the attempted robbery (H.Tr. 73, 363–64). This was a reasonable tactical decision under the circumstances and does not support a claim of ineffective assistance of counsel.

### B.

■ Petitioner argues counsel were ineffective in both the guilt and penalty phases of the trial for failing to introduce evidence of

---

5. In the context of a death sentence, the question is whether, but for counsel's deficient performance, there is a reasonable probability the jury would have concluded the balance of the aggravating and mitigating circumstances did not warrant death. *Id.,* 466 U.S. at 695, 104 S.Ct. at 2069.

6. Section 5–4–604(3) provides as an aggravating circumstance that "[t]he person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person."

his psychiatric disorder. He argues counsel were aware that he had an extensive history of psychiatric disorder over the fifteen to twenty-year period prior to the crime charged, and had in their possession some or all of his psychiatric reports. Nevertheless, petitioner argues, counsel failed to make use of this evidence to present either a diminished capacity defense in the guilt phase of the trial or as a mitigating factor in the penalty phase. Counsel explained at the habeas hearing that they did not introduce petitioner's psychiatric reports into evidence because they determined that the information contained in those reports would be more harmful than helpful (H.Tr. 31–35, 74–76, 376–77). The Court has examined each of the psychiatric reports included in the record and does not find the tactical decision to forgo use of those reports at either phase of the trial constituted ineffective assistance of counsel.

Admittedly, the reports show an individual who is emotionally unstable, has an intellectual capacity on the dull-normal side, and has some psychiatric neurosis (Police file, at 434, 577, 618, 620, 622, 630, 641–43, 646–48, 659–60, 668, 679, 715). However, those same reports also portray an immature and manipulative individual who has had numerous disciplinary problems, and an individual who is sexually deviate (including an episode where he took off all of his clothes in the TV room and invited all present to engage in intercourse with him). *Id.* In that respect, one report noted that petitioner used homosexuality as a means of removing himself from the general population and described his thought content "as that of a wronged, very petulant child who almost expects the world to do all for him beyond breathing," while another report noted petitioner had previously "shav[ed] his eyebrows and act[ed] feminine" (Police file, at 618, 648, 667).

Counsels' determination that such information was more harmful than helpful clearly represented the exercise of reasonable professional judgment. There is nothing in these reports to belie counsels' determination that their potential harm outweighed any possible benefit they might have had in bolstering a diminished capacity defense. While it is possible, as petitioner argues, that these reports could have been used in mitigation to show that he had certain mental problems, they could just as well have been seen by the jury as nothing more than a record of petitioner's personality disorders evidenced by bizarre and inappropriately aggressive behavior, a personality profile that is likely to fit most capital murder defendants. *See Guinan v. Armontrout,* 909 F.2d 1224, 1230 (8th Cir.1990), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 (1991). It is doubtful that evidence of this type would be considered mitigating by a jury, *id.,* a concern expressed by petitioner's co-counsel, Gordon Humphrey, Jr.: "[t]hose sort[s] of things we felt just wouldn't wash and especially wouldn't wash with a western Arkansas jury" (H.Tr. 32). Such a consideration falls within the wide range of deference given to counsel under *Strickland. Cf. Smith v. Armontrout,* 888 F.2d 530, 534–35 (8th Cir. 1989) (counsel not ineffective in guilt phase of trial for failing to introduce records that, while evidencing certain mental problems, depicted petitioner as a depraved and dangerous man who would not be deterred by mere imprisonment); *Swindler v. Lockhart,* 885 F.2d 1342, 1352 (8th Cir.1989) (counsel's decision in penalty phase of trial not to use state hospital report because it was determined that it would be more harmful than helpful was not ineffective assistance of counsel), *cert. denied,* 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990).[7]

7. Petitioner argues that counsel failed to raise diminished capacity as a defense during the guilt phase of his trial or as a mitigating factor during the penalty phase. He claims counsel failed to introduce or otherwise refer to evidence of his insanity, the psychological and medical problems from which he suffered, or the abuse he suffered as a child. However, the record shows that counsel did explore the flashbacks petitioner claimed he experienced in the past and in Mrs. Black's home as a result of the alleged sexual abuse he suffered from his mother and aunt (Tr.

1062–69). In addition, counsel elicited testimony from petitioner concerning medical problems he was having (including a seizure disorder and diabetic condition), the medication he was taking for those problems, and his mental state both on and off the medication (Tr. 1054–56). During the penalty phase of the trial, counsel argued that petitioner was acting under "an extreme emotional disturbance," a direct reference to petitioner's testimony concerning the flashbacks and medical problems from which he allegedly suf-

## C.

■ In a related claim, petitioner argues counsel were ineffective at the penalty phase of his trial for failing to conduct any meaningful investigation of mitigating factors. He claims counsel did not interview members of his immediate family or attempt to contact other witnesses whose names and addresses he provided, and argues that had these witnesses been contacted, they could have provided a detailed and compelling history of vicious, violent, and prolonged physical abuse he suffered from his father. The Court has carefully reviewed the record and does not find the conduct of petitioner's counsel was deficient, or if it was, that it affected the outcome of the penalty phase of the trial.

### 1.

At the habeas hearing, petitioner presented a videotaped and transcribed deposition of his aunt, Theomae Throne (hereinafter "Aunt Kiki"), and the written depositions of her husband, Leonard Junior Throne, and their two sons, Tom and Darrell Throne. Aunt Kiki testified that petitioner's father was a heavy drinker with a quick and violent temper, who generally did not seem to care for petitioner (Deposition of Theomae Throne, at 9–10, 12, 19). She recounted several severe and apparently unprovoked beatings of petitioner by his father, including instances where petitioner's father beat him with a baseball bat (at one point splitting his skin open and causing heavy bleeding), threw him across the room, shoved his head in a toilet, and beat him with a leather device called a "duck strap." *Id.* at 13–18, 22–24. She testified that these beatings began when petitioner was two and one half years of age and continued until he was sixteen or seventeen, and that in reaction to these beatings, petitioner would scream "Daddy, don't hit me. Daddy, please don't hit me." *Id.* at 13, 24. She opined that petitioner was a normal child until the beatings began. *Id.* at 51.

Aunt Kiki's husband and two sons gave similar, although relatively brief, testimony. Leonard Junior Throne testified that peti-

tioner's father "had a short fuse" and hit his son plenty of times (Deposition of Leonard Junior Throne, at 5). He noted that on one occasion, petitioner's father beat his son with a baseball bat, and on other occasions beat him with a "duck strap." *Id.* at 7–13. He opined that these beatings made petitioner "cuckoo." *Id.* at 14. Tom Throne testified that petitioner's father hit petitioner with a wooden baseball bat in the legs and arms at least two or three times, and on other occasions used a duck strap (Deposition of Tom Throne, at 7–8). Darrell Throne testified that petitioner's father beat petitioner all the time, called him names, hit him with sticks, and hit him with a baseball bat on more than one occasion (Deposition of Darrell Throne, at 6, 9, 10).

It is undisputed that counsel did not interview any of the Thrones in preparation for the penalty phase of the trial, and did not call any witnesses, other than petitioner himself, to establish the existence of mitigating evidence. However, when this case is considered under the standards set forth in *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), and *Strickland v. Washington, supra,* 466 U.S. 668, 104 S.Ct. 2052, counsels' performance in evaluating the potentially mitigating evidence that was available to them, and in not seeking further mitigating evidence, cannot be considered ineffective assistance.

In *Burger,* 483 U.S. 776, 107 S.Ct. 3114, the United States Supreme Court reviewed defense counsel's decision not to present mitigating evidence at the penalty phase of defendant's trial. The evidence that the defendant contended should have been presented would have shown he had an exceptionally unhappy and unstable childhood (including having possibly suffered brain damage from beatings when he was younger. *Id.* at 818, 107 S.Ct. at 3138 (Powell, J., dissenting)). Trial counsel was aware of some, but not all, of this family history before trial. After speaking with a psychologist whom counsel had employed to assist him in preparation for trial, a lawyer who had earlier acted as de-

---

fered (Tr. 1206–07). The fact is, the issue of diminished capacity was presented in both phas-

es of the trial—the jury simply rejected it.

fendant's "big brother," and defendant's mother, counsel concluded that his client's interest would not be served by presenting this type of evidence. The Court concluded:

> The record at the habeas corpus hearing does suggest that [counsel] could well have made a more thorough investigation than he did. Nevertheless, in considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Cronic,* 466 U.S. 648, 665, n. 38 [104 S.Ct. 2039, 2050, n. 38, 80 L.Ed.2d 657] (1984). We have decided that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S., at 690–691 [104 S.Ct. at 2066]. Applying this standard, we agree with the courts below that counsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment. It appears he did interview all potential witnesses who had been called to his attention and that there is a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty. Having made this judgment, he reasonably determined that he need not undertake further investigation to locate witnesses who would make statements about [petitioner's] past.

*Id.* at 794–95, 107 S.Ct. at 3126.

The Supreme Court faced a similar situation in *Strickland,* 466 U.S. 668, 104 S.Ct. 2052. There, defense counsel spoke with the defendant about his background. He also spoke on the telephone with the defendant's wife and mother, but did not follow up on the one unsuccessful effort to meet with them. Counsel did not otherwise seek out character witnesses for the defendant, nor did he request a psychiatric examination since his conversations with his client gave no indication that the defendant had psychological problems. Counsel decided not to present and hence not to look further for evidence con-

cerning the defendant's character and emotional state. The Court found as follows:

> [T]he record shows that [defendant's] counsel made a strategic choice to argue for the extreme emotional mitigating circumstance and to rely as fully as possible on [defendant's] acceptance of responsibility for his crimes. * * * Counsel's strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable. * * * Trial counsel could reasonably surmise from his conversations with [defendant] that character and psychological evidence would be of little help. [Defendant] had already been able to mention at the plea colloquy the substance of what there was to know about his financial and emotional troubles.

*Id.* at 699, 104 S.Ct. at 2070–2071. The Court concluded that trial counsel's defense, though unsuccessful, was the result of reasonable professional judgment. *Id.*

■ As these cases make clear, the decision not to present evidence at the penalty phase of a trial is well within the range of practical choices that are not to be second-guessed, as long as they are based on informed and reasoned judgment. *See Laws v. Armontrout,* 863 F.2d 1377, 1382–83 (8th Cir. 1988) (en banc) (counsel not ineffective during the penalty phase of capital murder prosecution for failure to contact and interview relatives and failure to offer psychiatric evidence), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989). The record in this case shows that counsel conducted a reasonable investigation under the circumstances and, based on information received from petitioner, made an informed and reasoned decision to argue for the extreme emotional disturbance mitigating circumstance and rely on petitioner's expression of remorse for the crime he had committed (Tr. 1205–08; H.Tr. 373–74). Indeed, counsels' performance does not differ significantly from the claims of ineffective assistance which were rejected in *Burger* and *Strickland.*

At the outset, the Court rejects petitioner's claim that counsels' performance in failing to

interview the Thrones was constitutionally deficient. Humphrey testified that he and Kirkpatrick had requested witnesses of petitioner that would be of some help, but that he "was not forthcoming with witnesses for a very, very long time" (H.Tr. 39). He noted that it was only two or three weeks prior to trial that petitioner provided them with a witness list, and that the list he finally provided "was [a] kind of hand-scrawled-out list" that "didn't have addresses or—telephone numbers or—or indicate what they might have been." *Id.* Sometime before trial, petitioner provided a second list that, although "more legible," contained many of the same names (H.Tr. 39–40, 57). With respect to the Thrones, however, the first list merely states the following:

Kiki Throne

her husband name is

Lenerd Throne Tracy Calif

(Plaintiff's exhibit # 2). There is no indication from the manner in which Leonard Throne is mentioned that petitioner intended that he be called as a witness, and petitioner's list does not make any reference to the Thrones' two sons. In the second, more legible list, petitioner includes some twenty-one names and states at the end "these are the people I want in court for me," but mentions none of the Thrones[8] (Plaintiff's exhibit # 2). Counsel cannot be found ineffective for failing to interview Leonard, Tom, and Darrell Throne when petitioner was not sufficiently forthcoming with these names. *Cf. Burger,* 483 U.S. at 794, 107 S.Ct. at 3126.

■ Nor can counsel be found ineffective for failing to interview Aunt Kiki. Counsel knew that putting Aunt Kiki on the stand and having her possibly dispute petitioner's allegations of sexual abuse could have undermined petitioner's claim that he was acting under an extreme emotional disturbance as a result of the sexual abuse he claims he suffered from his mother and aunt.[9] True,

Humphrey does not recall whether at the time petitioner gave him the list of potential witnesses that Aunt Kiki was not contacted because petitioner had accused her of sexual abuse, or whether she wasn't contacted because there was not a specific address for her (H.Tr. 48–49). He does recall, however, a discussion between Kirkpatrick and petitioner about Aunt Kiki and whether she should be called or what exactly she could offer, and that it was determined that she should not be called to the stand (H.Tr. 50). In that respect, Kirkpatrick testified he was aware at the time of trial that petitioner had accused Aunt Kiki of sexual abuse and that he was certain they talked to petitioner about her before trial (H.Tr. 371, 385, 388). When questioned at the habeas hearing regarding the testimony of Aunt Kiki, Kirkpatrick testified as follows:

Q. Now you have testified that you weren't aware of any—that Mr. Whitmore never made you aware of any physical abuse by his father?

A. No, ma'am, he never did.

Q. And when did you first become aware of this?

A. In preparing for this proceeding.

Q. Had you known that Aunt Kiki could have testified about physical abuse reaped upon Jonas as he was a child, would you have called her in mitigation?

A. As I recall—the testimony, and now I'm referring to the records, that—that we had, as I recall, Aunt Kiki was brought into it as a person who supposedly had also abused Jonas as a child.

Q. Correct.

A. It would not have been good practice to bring her in as a witness for the defense. I would also say that it probably would have been useless for us to contact her and tell her, "We're defense counsel representing Joseph [sic] Whitmore. He claims you have abused him as a child.

8. The Court thus rejects petitioner's claim that the lists of witnesses he provided counsel included the names of not only Aunt Kiki, but also her husband, Leonard Junior Throne, and their two sons, Tom and Darrell Throne (Petitioner's Pre-Trial Brief, at 7).

9. As previously noted, petitioner testified that his mother and aunt sexually abused him as a child and that certain events would trigger flashbacks of that abuse. Aunt Kiki denies that she or her sister (petitioner's mother) sexually abused petitioner as a child (Deposition of Theomae Throne, at 42).

What do you have to say about that?" I can't see that eliciting any sort of a favorable response from a witness. In fact, if anything, it would have alienated her, I think. And I just can't see that it would have done us any good to have her. I know now what she's supposed to have said.

(H.Tr. 377–78). Similarly, Humphrey noted that he was "not sure how important it would have been if the one who was accused of having done it and called as a witness on his behalf then was forced to sit on the stand and call him a liar and say that it did not happen" (H.Tr. 49). The Court agrees and finds counsels' decision not to interview Aunt Kiki and pursue what appeared to be a useless and possibly harmful line of investigation was reasonable from their perspective at the time that decision was made, *see Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir.) (en banc), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990), and represented the exercise of reasonable professional judgment.

Petitioner's claim of ineffective assistance with respect to the other witnesses he claims counsel should have called is equally unavailing. Humphrey testified that he and Kirkpatrick met with petitioner to go over the list with him to find out who these people were and what they might be able to say or not say (H.Tr. 40). He testified they sent a letter to Alpha Newton who, according to petitioner's list, lived with four other possible witnesses, but that it was returned marked "no such address" and "left no forwarding address" (H.Tr. 42). He talked to Vicki Whitmore, petitioner's wife, but she was not interested in being a mitigation witness for her husband, and petitioner later indicated he did not want counsel to call her against her will (H.Tr. 43–44). He spoke with Dick and Sharon Ewen, persons that lived in Montana where petitioner was arrested, but they had not known him very long and "didn't have much to offer" (H.Tr. 44–45, 55–56).

Humphrey reiterated that he and Kirkpatrick went through most of the witnesses on the list and inquired of petitioner what contacts he had with them, how long it has been since they had seen him, and what they actually knew about him (H. Tr. 50). He testified that some of the witnesses discussed with petitioner, such as deputy sheriff James Scott, were not contacted because they either had not seen him in a number of years, or they were people who petitioner indicated that "he'd only met briefly and had no real substantial knowledge of a relationship with, either met them in a bar or similar situation like that" (H.Tr. 48, 54). Others were not contacted because addresses and phone numbers were not provided, and petitioner "kept wanting his wife who was unwilling, and really didn't stress many of these other folks" (H.Tr. 54–60). Counsel ultimately determined that "time would be better spent somewhere else than on contacting people, the same as we did with the deputy sheriff who'd indicated to us that his only contact with [petitioner] had been through an arrest" (H.Tr. 48, 54–55).

Kirkpatrick likewise testified that petitioner would not talk of mitigation witnesses until shortly before trial and that he mostly talked about his wife, who he wanted to testify at the trial (H.Tr. 365, 383). He noted that Mrs. Whitmore was very close to the police, and that petitioner's father, another witness on the list, was angry at the things petitioner had said about his mother and was not willing to help (H.Tr. 365, 374–75). Kirkpatrick testified that he and Humphrey spent time attempting to verify the existence of "Robert," a hitchhiker petitioner had earlier implicated in the murder, going so far as to petition for an investigator, but that petitioner later recanted that story (H.Tr. 373). He noted that petitioner never mentioned being physically or verbally abused by his father while growing up, and that such information did not appear in any of the reports they reviewed (H.Tr. 371, 389).

It is petitioner's burden to prove the scope and weight of the evidence that his counsel has failed to offer. *Stokes v. Armontrout*, 851 F.2d 1085, 1095 (8th Cir.1988) ("not enough merely to speculate that a tearful parent on the stand might have evoked pity"), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 823, 102 L.Ed.2d 812 (1989). With the exception of the Thrones, petitioner does not provide the testimony of any of the witnesses

he claims counsel were ineffective for failing to call, nor does he otherwise indicate how these witnesses would have been helpful. There is no evidence in the record to indicate that petitioner gave counsel information which would have led them to reasonably conclude further investigation was necessary, *see Cox v. Wyrick,* 642 F.2d 222, 226 (8th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3013, 69 L.Ed.2d 394 (1981), and, in fact, counsels' repeated conversations with petitioner provided what was either incomplete or useless information. Counsel cannot be found ineffective where petitioner provided only vague, largely unhelpful, testimony, *see Russell v. Jones,* 886 F.2d 149, 152 (8th Cir.1989), nor can counsel be said to have been ineffective because they failed to interview witnesses whom they had little reason to believe would be useful or helpful. *Sanders v. Trickey,* 875 F.2d 205, 210 (8th Cir.), *cert. denied,* 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 201 (1989). Based on the information supplied by petitioner, it was not unreasonable for counsel to conclude that their best course of action was to rely on petitioner's testimony and have him show remorse for the crime he had committed. As stated in *Strickland,*

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful,

counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.,* 466 U.S. at 691, 104 S.Ct. at 2066.

In sum, the Court concludes counsel were not ineffective as they interviewed enough potential witnesses under the circumstances, had a reasonable basis for not interviewing other witnesses and, as explained here and in section III(B) of this opinion, had a reasonable strategic basis for not presenting some of the potentially mitigating evidence they had uncovered.

2.

■ Even if it could be said that counsels' performance fell below an objective standard of reasonableness, petitioner has not demonstrated a reasonable probability that the result of the penalty phase would have been different had counsel performed differently. The jury in this case was not without mitigating information in determining the appropriate sentence for petitioner. Counsel attempted to overcome the state's exceptionally strong case by portraying petitioner's humanity to the jury. They had petitioner talk about his daughters and the contact he has made with them, and had petitioner explain that he had attempted suicide over the remorse he felt for killing Mrs. Black (Tr. 1196–97). In addition, counsel forcefully argued to the jury that it should not consider a twenty-three-year-old conviction as an aggravating circumstance and, in a specific reference to a statutory mitigating circumstance, argued that petitioner was acting under an "extreme emotional disturbance" [10] (Tr. 1205–08). In that respect, the same jury had recently heard testimony that petitioner was suffering from flashbacks as a result of alleged sexual abuse from his mother and aunt, and that he was suffering from a seizure disorder and diabetic condition for which he took, among other things, dilantin and phenobarbital [11] (Tr. 1005, 1054–56, 1066–69).

---

10. Ark.Code Ann. § 5–4–605(1) provides as a mitigating circumstance that "[t]he capital murder was committed while the defendant was under extreme mental or emotional disturbance." The checklist that was submitted to the jury included this mitigating circumstance (Tr. 1209A).

11. Ark.Code Ann. § 5–4–605(3) provides as a mitigating circumstance that "[t]he capital murder was committed while the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of

Although the Thrones might have testified to admittedly tragic beatings of petitioner as a child, their testimony would not have added significantly to the mitigating information the jury already had before them and would not in all probability have been able to overcome the extent and impact of the evidence presented during the guilt phase of the trial. Moreover, these witnesses might well have given testimony that was at odds with the defense strategy of showing that petitioner felt remorse. Aside from the other problems Aunt Kiki presented as a witness, she testified that petitioner was "sneaky evil, sneaky mean ... [a]nything to—to be cruel, to hurt someone, try to hurt" (Deposition of Theomae Throne, at 49). Leonard Throne noted petitioner's violent tendencies, including how petitioner cut his son's head open with a coffee can full of dirt, attempted to hit his son with a hammer, and stole things from various people (Deposition of Leonard Junior Throne, at 14–15). Tom Throne testified that petitioner would "throw rocks, maybe break out somebody's window, or take a slingshot and shoot you with it. Or like me and my brother, he would sneak up behind and hit us with a hand saw or a coffee can full of dirt. Split my head open a couple of times with that" (Deposition of Tom Throne, at 11). Darrell Throne testified that petitioner was "destructive, mean, [and] vicious," and that "if you didn't watch it, he would do something to you during these times when he just lost control" (Deposition of Darrell Throne, at 10–11). In fact, he recounted how he saw petitioner "rip the head off of a kitten one time and laugh about it while he was doing it. He had this real evil look and crazy look in his eyes, and the cat hadn't done anything to him, just walked up to him." *Id.* at 11. It is doubtful the jury would have reacted with sympathy at this testimony and attributed such behavior to the beatings petitioner allegedly suffered as a child.

In sum, petitioner has failed to show the existence of mitigating evidence that would have changed the result of the penalty phase of the trial had it been presented to the jury. The Court's confidence in the outcome of the sentencing has not been undermined. *Cf.*

*Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071 (no prejudice where counsel failed to offer any mitigating evidence, even though fourteen friends, neighbors, and relatives of defendant would have testified defendant was "basically a good person who was worried about his family's financial problems" and psychiatric reports stated that defendant was "chronically frustrated and depressed because of his economic dilemma"); *Stokes v. Armontrout, supra,* 851 F.2d 1085 (no prejudice where counsel failed to offer testimony of defendant's parents as mitigating evidence).

### D.

Petitioner argues counsel were ineffective for failing to raise certain constitutional defects in the Arkansas death penalty scheme, issues he argues were vital to his case and later appeals. The Court finds petitioner has not shown ineffective assistance of counsel on this point because there is no merit to his claims that the Arkansas death penalty scheme is unconstitutional. Since the claims regarding the constitutionality of the Arkansas death penalty scheme are without merit, so is the ineffective assistance claim; it cannot be ineffective assistance not to raise a meritless argument. *Larson v. United States,* 833 F.2d 758, 759 (8th Cir.1987), *cert. denied,* 486 U.S. 1008, 108 S.Ct. 1736, 100 L.Ed.2d 200 (1988). Each of these claims will be addressed in turn.

### 1.

Petitioner argues the aggravating circumstance providing that the murder was committed for the purpose of avoiding or preventing an arrest, Ark.Code Ann. § 5–4–604(5), unconstitutionally duplicates an element of the underlying felony of robbery which a person commits "if, with the purpose of committing a theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another." Ark.Code Ann. § 5–12–102. Such "double counting," he argues, violated the rule that was established in *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.), *cert.*

---

mental disease or defect, intoxication, or drug abuse." The checklist that was submitted to the

jury included this mitigating circumstance (Tr. 1209A).

*denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985), and which was in effect at the time of his trial.[12]

The Court in *Woodard v. Sargent,* 806 F.2d 153, 156 (8th Cir.1986), rejected just such an argument, concluding that since avoiding arrest is not necessarily an invariable motivation for killing, the aggravating circumstance of avoiding arrest does not as a matter of logic necessarily duplicate an element of the underlying capital crime of robbery. *Woodard* was decided on November 20, 1986, well before petitioner's trial, and is dispositive of this issue.

Even without benefit of the court's decision in *Woodard,* it would not be necessary for the Court to determine whether this aggravating circumstance unconstitutionally duplicates an element of the underlying offense of robbery since the prosecution amended the information charging petitioner with capital murder to delete the phrase "... or resisting apprehension immediately thereafter," and the trial court did not include that phrase in its instruction to the jury defining robbery (Tr. 54, 87, 176–77, 1155). Therefore, no "double counting" or use of the same conduct to satisfy both the underlying felony and aggravating circumstance occurred in this case.[13]

### 2.

Petitioner argues the aggravating circumstance providing that the murder was committed for the purpose of avoiding or preventing an arrest is vague, overbroad, and fails to narrow and channel the jury's discretion in determining the appropriateness of punishment. He argues this aggravating circumstance is arbitrarily used to bolster the State's claim that the death penalty is warranted in any capital murder trial. The Court disagrees.

Although a consequence of every murder is the elimination of the victim as a potential witness, avoiding arrest is not, as previously noted, necessarily an invariable motivation for killing. *Woodard v. Sargent, supra,* 806 F.2d at 156. While a jury may have to determine whether a defendant killed to avoid or prevent arrest from circumstantial evidence, there is nothing vague or overbroad in the statutory description of that intent. *Coulter v. State,* 304 Ark. 527, 533, 804 S.W.2d 348, 351 (1991), *cert. denied,* — U.S. ——, 112 S.Ct. 102, 116 L.Ed.2d 72 (1991). On its face, this aggravating circumstance satisfies the requirement that the State "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Lewis v. Jeffers,* 497 U.S. 764, 774, 110 S.Ct. 3092, 3099, 111 L.Ed.2d 606 (1990) (quoting *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–1765, 64 L.Ed.2d 398 (1980)).[14]

**12.** The Court in *Collins* held that imposing the death penalty on the basis of an aggravating circumstance that duplicated an element of the underlying felony was unconstitutional because such a process failed to narrow the class of persons eligible for the death penalty and justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder. *Id.* at 264. In *Perry v. Lockhart,* 871 F.2d 1384, 1393 (8th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 378, 107 L.Ed.2d 363 (1989), the Court held that *Collins* had been overruled by *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). The Court found that Arkansas had satisfied the constitutionally required narrowing function and, further, found that *Lowenfield* must be applied retroactively as it did not create a new rule of law. *Id.* 871 F.2d at 1393–94. *But see Fretwell v. Lockhart,* 946 F.2d 571 (8th Cir.1991) (the question in ineffective assistance of counsel cases is whether the defendant was entitled to the benefits of an undisturbed *Collins* at the time of his or her sentencing), *cert. granted,* — U.S. ——, 112 S.Ct. 1935, 118 L.Ed.2d 542 (1992).

**13.** Although petitioner additionally argues the pecuniary-gain aggravating circumstance unconstitutionally duplicates an element of the underlying felony of robbery, he acknowledged at the habeas hearing that he erred in raising this issue as the jury was not instructed on the aggravating circumstance of pecuniary gain (H.Tr. 397–98).

**14.** Petitioner argues there was no evidence to support the jury's finding that the murder was committed for the purpose of avoiding arrest, thus proving this aggravating circumstance is applied in an arbitrary manner. In determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth Amendment violation, the appropriate standard of review is the "rational factfinder" standard established in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560

### 3.

Petitioner argues the elements of the Arkansas capital felony murder statute, Ark. Code Ann. § 5–10–101, impermissibly overlaps with elements of the Arkansas first degree murder statute, Ark.Code Ann. § 5–10–102. Such an overlap, he argues, allows the state unbridled discretion in its charging decision and the jury unguided discretion in its guilt-innocence decision.

This same argument was rejected in *Simpson v. Lockhart,* 942 F.2d 493 (8th Cir. 1991). There, the petitioner argued that the overlap between the Arkansas capital felony murder and first-degree felony murder statutes impermissibly affords prosecutors, and juries, what amounts to unbridled discretion to choose between capital and first-degree murder and thus presents the risk that conviction for capital or first-degree felony murder, and the possible imposition of a death sentence, will be arbitrary. *Id.* at 496. In rejecting petitioner's argument, the Court concluded as follows:

> Here, each statute unambiguously specifies the conduct prohibited and the penalties authorized upon conviction. This satisfies the fair notice requirements of the due process clause. *Id.* [*United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)]; *accord Cromwell v. State,* 269 Ark. 104, 598 S.W.2d 733 (1980). "Although the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments." *United States v. Batchelder,* 442 U.S. at 123, 99 S.Ct. at 2204.

> Petitioner does not argue that the state's decision to prosecute him for capital felony murder ... rather than first-degree felony murder was in some way discriminatory.

*See id.* at 123–24, 99 S.Ct. at 2203–04 (when act violates more than one criminal statute, defendant may be prosecuted under either so long as no discrimination against any class of defendants).

> We therefore hold the overlapping capital felony murder and first-degree felony murder statutes are not unconstitutionally vague.

*Id.* at 497.

In the case at bar, petitioner does not argue the state's decision to prosecute him for capital felony murder was in some way discriminatory, and his arguments concerning the statutory overlap are, for the reasons set forth in *Simpson,* lacking in merit.

### 4.

Petitioner argues the Arkansas death penalty statutes do not inform the jury that it may show mercy by sentencing the defendant to life without parole, even though it might find that aggravating circumstances justify the imposition of the death penalty. He argues the statutory scheme as set out in Ark Code Ann. § 5–4–603, is unconstitutionally mandatory in nature and impermissibly restricts the jury's consideration of all relevant mitigating circumstances. The Court disagrees.

Ark.Code Ann. § 5–4–603 provides in pertinent part as follows:

> (a) The jury shall impose a sentence of death if it unanimously returns written findings that:

> (1) Aggravating circumstances exist beyond a reasonable doubt; and

> (2) Aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and

> (3) Aggravating circumstances justify a sentence of death beyond a reasonable doubt.

(1979). *See Lewis v. Jeffers,* 497 U.S. at 781, 110 S.Ct. at 3102. The Court has examined the record and, considering the manner in which Mrs. Black was killed and petitioner's subsequent attempts at concealing his involvement in the crime, has no hesitation in concluding that a rational trier of fact could have found beyond a reasonable doubt that the murder was committed for the purpose of avoiding or preventing an

arrest. *Cf. Grubbs v. Delo,* 948 F.2d 1459, 1470 (8th Cir.1991) ("[i]f one infers that Grubbs and his brother went to Thornton's home to rob him of his money, one can also reasonably infer that Grubbs and his brother murdered Thornton to ensure that they would not be reported and arrested"), *petition for cert. filed,* (U.S. Apr. 30, 1992) (No. 91–8129).

The jury was instructed that if it found for the state on all three elements, it "will impose the death penalty" (Tr. 1201–02).

In *Singleton v. Lockhart*, 962 F.2d 1315, 1323 (8th Cir.1992), the Court rejected this same attack upon the constitutionality of Ark.Code Ann. § 5–4–603, agreeing with the district court that such an argument was foreclosed by the United States Supreme Court's holdings in *Blystone v. Pennsylvania*, 494 U.S. 299, 302, 110 S.Ct. 1078, 1081, 108 L.Ed.2d 255 (1990), and *Boyde v. California*, 494 U.S. 370, 374, 110 S.Ct. 1190, 1195, 108 L.Ed.2d 316 (1990). The Court found that in both of those decisions, death penalty statutes that are much less favorable to a defendant than the Arkansas statute were upheld. *Id.*

In *Blystone*, the Supreme Court upheld a death penalty statute that provided "[t]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." The Court found that the statute was not impermissibly mandatory and that it satisfied the requirement that a capital-sentencing jury be allowed to consider and give effect to all relevant mitigating evidence. *Id.* 494 U.S. at 305, 110 S.Ct. at 1082.

Similarly, in *Boyde,* the Supreme Court upheld an instruction which told the jury that "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall impose* a sentence of death." *Id.* 494 U.S. at 374, 110 S.Ct. at 1195. (Emphasis in original.) The Court concluded that the language providing that the jury shall impose a sentence of death did not unconstitutionally prevent "individualized assessment" by the jury. *Id.* at 376, 110 S.Ct. at 1196.

The Arkansas statute and instruction are more favorable than those in *Blystone* and *Boyde* since even if the jury finds that the aggravating circumstances outweigh the mitigating circumstances, it may nevertheless reject the penalty of death if it finds the aggravating circumstances do not justify a penalty of death beyond a reasonable doubt. *See*

*Pickens v. State,* 301 Ark. 244, 248, 783 S.W.2d 341, 343–44 (1990) ("[t]he third finding allows the jury to reject the death penalty *in spite of* the fact that the aggravating circumstances outweigh the mitigating"), *cert. denied,* 497 U.S. 1011, 110 S.Ct. 3257, 111 L.Ed.2d 766 (1990). Such a provision adequately assures that the jury does not apply the instruction in a way that prevents the consideration of constitutionally relevant evidence. *Boyde,* 494 U.S. at 377, 110 S.Ct. at 1196; *Walton v. Arizona,* 497 U.S. 639, 652, 110 S.Ct. 3047, 3056, 111 L.Ed.2d 511 (1990).

## IV.

Petitioner next attacks the constitutionality of the Arkansas death penalty scheme on five grounds:

(1) the aggravating circumstance providing that the murder was committed for the purpose of avoiding arrest, Ark.Code Ann. § 5–4–604(5), is overly broad and vague in that it fails to narrow and channel the jury's discretion in determining the appropriateness of punishment and, further, no evidence was presented to the jury to support a finding of this aggravating circumstance;

(2) the aggravating circumstance providing that the murder was committed for the purpose of avoiding arrest duplicates an element of the underlying felony in the capital murder case against petitioner;

(3) the penalty phase provisions of the Arkansas death penalty statute, Ark.Code Ann. § 5–4–603, are unconstitutionally mandatory in nature and, alternatively, are unconstitutionally mandatory as applied in this case;

(4) there is an improper overlap between the definitions of capital and first degree murder under the Arkansas statutory scheme, making the scheme void for vagueness and giving the prosecutor unbridled discretion; and

(5) the use of a twenty-three-year-old conviction as an aggravating circumstance fails to adequately narrow the class of death-eligible defendants and renders Ark.

Code Ann. § 5–4–604(3) so impermissibly broad as to violate due process.

### A.

Respondent contends petitioner is procedurally barred from asserting claims one, two, three, and four as direct constitutional challenges because he failed to raise these claims at trial. The Court has reviewed the record and agrees petitioner did not raise these claims at trial and that he has not shown cause for this procedural default.

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* —— U.S. ——, ——, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

Petitioner does not dispute his failure to preserve these claims at trial. He argues instead that this failure is "satisfied by [his] inclusion of each of these constitutional claims in his Rule 37 petition to the state court" (Petitioner's Pre–Trial Brief, at 25). The Court disagrees. The state courts had no opportunity to decide petitioner's claims on the merits because petitioner failed to present his claims to those courts in a procedurally correct manner. *See Harris v. Lockhart,* 948 F.2d 450, 452 (8th Cir.1991). While he did raise these claims in a post-conviction petition pursuant to Ark.R.Crim.P. 37, that rule is not intended as a vehicle to allow a petitioner to raise questions which might have been raised at trial or on direct appeal. *Neal v. State,* 270 Ark. 442, 447, 605 S.W.2d 421, 424 (1980). In that respect, the Arkansas Supreme Court, pursuant to an independent and adequate state procedural rule, specifically declined to address these claims in petitioner's Rule 37 petition because he failed to raise these claims in the trial court. *Whitmore v. State,* 299 Ark. at 66–68, 771 S.W.2d at 271–72.

Petitioner argues ineffective assistance of counsel as cause for his failure to properly raise these claims in state court. Certainly ineffective assistance of counsel is cause for a procedural default, *see Coleman,* —— U.S. at ——, 111 S.Ct. at 2567, and petitioner did raise these claims in his Rule 37 petition, not only as direct constitutional challenges, but in the context of an ineffective assistance of counsel claim as well. However, the Court has already found in Section III(D) of this opinion that counsel were not ineffective for failing to raise these claims at trial since there is no merit to his arguments that the Arkansas death penalty scheme is unconstitutional. Petitioner therefore cannot use ineffective assistance of counsel as cause for his procedural default. As petitioner does not present a case where application of the cause and prejudice test will result in a "fundamental miscarriage of justice," *Coleman,* —— U.S. at ——, 111 S.Ct. at 2565, federal habeas review of claims one, two, three, and four in the context of direct constitutional challenges is barred.[15]

---

15. Petitioner raises three additional claims concerning the constitutionality of the Arkansas death penalty scheme: (1) the death penalty in Arkansas is imposed in an arbitrary and capricious manner; (2) the phrase "under circumstances manifesting extreme indifference to the value of human life" fails to give individuals fair notice of the prohibited activity; and (3) Arkansas' death penalty statute is unconstitutional because it penalizes the exercise of the Sixth Amendment right to trial by jury (Petitioner's Pre–Trial Brief, at 30–33). These claims were not raised in any state court or even in his petition for writ of habeas corpus, but are raised for the first time in his pre-trial brief. To the extent petitioner is asserting ineffective assistance of counsel as cause for his failure to present these claims in state court, the exhaustion doctrine requires that such a claim be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Scroggins v. Lockhart,* 934 F.2d 972, 975 (8th Cir.1991) (citing *Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1986)). Petitioner cannot use ineffective assistance of counsel to establish cause for his procedural default with respect to these new claims because such a claim was never presented to any state court. *Id.* This is so whether the claim of ineffective assistance of counsel is asserted as cause for the procedural default or denominated as a ground for habeas relief. *Id.* (citing *Leggins v. Lockhart,* 822 F.2d 764, 768 n. 5 (8th Cir.1987), *cert. denied,* 485

## B.

In his fifth claim, petitioner argues the use of a twenty-three-year-old conviction as an aggravating circumstance renders Ark.Code Ann. § 5–4–604(3) impermissibly broad and fails to adequately narrow the class of death-eligible defendants. He additionally argues the use of such a conviction violates due process in that one moment's indiscretion as a youth can lead to the death penalty. Petitioner's argument is without merit on both counts.

Ark.Code Ann. § 5–4–604(3) provides as an aggravating circumstance that "[t]he person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person." On its face, this aggravating circumstance makes a distinction between those capital defendants who have never committed a violent crime and those who have. Such a distinction adequately narrows the class of death eligible defendants and permits the sentencer to make a principled distinction between those who deserve the death penalty and those who do not. *Lewis v. Jeffers,* 497 U.S. at 776, 110 S.Ct. at 3099.

While this aggravating circumstance does not place any time restrictions on which violent crimes may be considered, *see Hill v. State,* 289 Ark. 387, 396, 713 S.W.2d 233, 237 (1986) (this section applies to crimes not connected in time or place to the killing for which the defendant has just been convicted), *cert. denied,* 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 182 (1987), the jury must still find, pursuant to Ark.Code Ann. § 5–4–603(a)(3), that the "[a]ggravating circumstances justify a sentence of death beyond a reasonable doubt." Thus, in the event the jury finds that the defendant committed a violent crime many years ago, it may take into account that the previous crime was, as petitioner argues in his case, nothing more than one moment's indiscretion as a youth and reject the penalty of death on that basis. *See* Section III(D)(4) of this opinion. Using a

U.S. 907, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988)). *See also Harris v. Lockhart,* 948 F.2d at

twenty-three-year-old attempted robbery conviction to establish an aggravating circumstance did not violate petitioner's due process rights in any manner. *See Hill v. Lockhart,* 927 F.2d 340, 344 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 344, 116 L.Ed.2d 283 (1991).

## V.

Petitioner next contends the State introduced custodial statements obtained from him in violation of his Fifth, Sixth, and Fourteenth Amendment rights, and contends that evidence of his conviction for attempted robbery in the State of California was improperly introduced under Rule 609 of the Arkansas Rules of Evidence. These claims will be addressed in turn.

## A.

Petitioner contends the State introduced statements that were obtained from him in an unconstitutional manner. He argues the statement of rights given to him was so defective as to render any alleged waiver of those rights invalid. He additionally argues that these warnings, in addition to their inherent defects, were attenuated by the passage of time and events prior to the custodial interrogations, and that he lacked the mental capacity to make a knowing and intelligent waiver of his rights even had they been properly presented to him. Having carefully considered the totality of the circumstances, *see Evans v. Dowd,* 932 F.2d 739, 742 (8th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 112 S.Ct. 385, 116 L.Ed.2d 335 (1991), the Court concludes each of petitioner's statements was obtained in a constitutional manner.

The record shows that on September 23, 1986, at approximately 5:00 p.m., petitioner was arrested in Roundup, Montana by Sheriff Brian Neidhardt on the basis of a warrant from Montgomery, County, Arkansas, and by F.B.I. Special Agent John Munis on an unlawful flight to avoid apprehension warrant (Tr. 196–97, 232). Petitioner was

452.

transported to the sheriff's office where, approximately fifteen minutes after his arrest, he was given a statement of rights by Agent Munis which provided in pertinent part as follows:

If you cannot afford a lawyer, one may be appointed for you before questioning or at anytime during questioning, if you so desire.

(Tr. 212, 229, 232–36, 245, 313, 981–83). Petitioner acknowledged understanding his rights (Tr. 236, 982). Later that night, at approximately 10:00 p.m., Sergeant Russell Welch, a criminal investigator with the Arkansas State Police, arrived in Roundup to arrest petitioner (Tr. 252, 256–57, 1008–009). He was accompanied by Montgomery County Sheriff James Carmack and Arkansas State Police investigator Jack Usery (Tr. 256). Upon arriving in Roundup, Sergeant Welch and the others attended to some work that had been prepared for them and which had to be taken care of first (Tr. 994). When they finished their work, it was shortly before 3:00 a.m. *Id.* Petitioner was awakened [16] and brought to the sheriff's office where Sergeant Welch administered a second warning which provided in pertinent part as follows:

Do you understand that if you cannot afford a lawyer, one will be appointed for you by the court before any questioning if you so desire?

(Tr. 229, 259–61, 280, 288, 990–93). Petitioner indicated orally and in writing that he understood the question. *Id.*

Petitioner first contends these two warnings did not meet the standards set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because the first warning "simply informed him that some unknown entity *might* appoint a lawyer for him," while the second warning "may have, at best, suggested that an Arkansas court would appoint a lawyer at some future date."

The Arkansas Supreme Court found the two warnings together were sufficient to notify petitioner that if he could not afford a lawyer one would be appointed for him at no cost. *Whitmore v. State,* 296 Ark. at 311, 756 S.W.2d at 892. The Court agrees.

*Miranda* provides that prior to custodial interrogation, a suspect must be advised "that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630. There is, however, no rigid rule requiring that the warnings to an accused be a virtual incantation of the precise language set forth in the *Miranda* opinion, *see California v. Prysock,* 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981) (per curiam), and reviewing courts need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. *Duckworth v. Eagan,* 492 U.S. 195, 203, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1989). Rather, "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*'" *Id.* (quoting *California v. Prysock,* 453 U.S. at 361, 101 S.Ct. at 2810). The Court has carefully examined the warnings given to petitioner and agrees with the Arkansas Supreme Court that the cumulative effect of those warnings was such that petitioner was fully informed of his constitutional right to the presence of an attorney. *Cf. Chambers v. Lockhart,* 872 F.2d 274, 275 (8th Cir.) (*Miranda* warnings found to be adequate when those warnings failed to advise suspect that a court-appointed attorney would be provided free of charge if he could not afford one), *cert. denied,* 493 U.S. 938, 110 S.Ct. 335, 107 L.Ed.2d 324 (1989).[17]

■ Petitioner additionally argues these warnings were attenuated by the passage of time and events prior to the custodial interrogations. He argues that it took more than

---

16. Sergeant Welch testified that after finishing the work that had been prepared for them, "it was just standard procedure regardless of time ... to have the warrant served on him and advise him of his rights" (Tr. 994).

17. The Court notes as well that petitioner has had extensive experience with the criminal jus-

tice system. The record shows that between July 12, 1962, and August 8, 1986, petitioner was arrested over twenty times for various felonies and misdemeanors, several of which led to incarceration (Tr. 383–87; Police file, at 726–30). Petitioner requested and/or was furnished counsel on several of these occasions. *Id.*

twenty-four hours for the officers to transport him from Montana to Arkansas, and that during the trip back and the two days following, incriminating statements concerning the murder were taken without additional warnings being given. He additionally argues he lacked the mental capacity to make a knowing and intelligent waiver of his rights.

As previously noted, petitioner was given *Miranda* warnings at approximately 5:15 p.m. on September 23, 1986, and approximately 3:00 a.m. on September 24, 1986. The next morning, on September 25, 1986, the officers and petitioner left Montana for Arkansas (Tr. 272). Petitioner gave a statement on the morning of September 26, 1986, during the trip back to Arkansas (Tr. 1003). He gave two additional statements while being held in the Montgomery County jail, the first on September 27, 1986, and the second, which was taped, on September 28, 1986 (Tr. 279, 326–34, 1003–08, 1021, 1027–45). The Arkansas Supreme Court found that the first two statements were spontaneous, and that in any event, the *Miranda* warnings previously given were close enough in time so that petitioner knew he was free to exercise his Fifth Amendment privileges. *Whitmore v. State*, 296 Ark. at 313–14, 756 S.W.2d at 893. The Court agrees.

 The record leaves no doubt that with respect to the statements of September 26, 1986, and September 27, 1986, petitioner himself initiated the conversations and volunteered the information in question (Tr. 283, 285, 320–24, 360–61, 1002–003, 1010–11). *Miranda* has no application to statements that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response. *See United States v. Griffin*, 922 F.2d 1343, 1357 (8th Cir.1990); *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989), *cert. denied*, 496 U.S. 909, 110 S.Ct. 2595, 110 L.Ed.2d 276 (1990); *Stumes v. Solem*, 752 F.2d 317, 322–23 (8th Cir.), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985).

With respect to the statement of September 28, 1986, the record shows that petitioner wanted to make this statement even though he knew his attorneys had advised against it

(Tr. 279–81, 283–85, 293–96, 299, 332, 341, 350, 1042). In fact, during the suppression hearing and prior to *voir dire*, counsel for petitioner specifically complained to the trial judge that petitioner was ignoring their advice to keep quiet (Tr. 189–90, 454; H.Tr. 15–16). The Fifth Amendment privilege against self-incrimination may be waived if that waiver is knowing, intelligent, and voluntary. *Russell v. Jones, supra*, 886 F.2d at 151 (citing *Colorado v. Spring*, 479 U.S. 564, 572, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987)). A waiver satisfies this standard if it is made free from any coercion or deception, and "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986)). There is simply nothing in the record to indicate that petitioner's waiver did not satisfy this standard. Petitioner had twice been informed of his rights in a manner consistent with *Miranda*, and he expressly acknowledged that the statement was a voluntary statement at his request, that he had previously been advised of his rights, and that he was not promised anything or threatened in any way (Tr. 332, 350, 1042).

 Nevertheless, petitioner now claims he had a long history of mental disturbance and was on certain prescription medication which "could reasonably" have affected his ability to understand the warnings and give a valid waiver of his rights (Petitioner's Pre–Trial Brief, at 21). The Court finds federal habeas review of this issue is barred because it was not properly presented to the state court. Although the issue of petitioner's medication was alluded to in the suppression hearing (Tr. 362), petitioner's sole argument in the Arkansas Supreme Court concerning his mental capacity to understand and waive his rights was that the second *Miranda* warning was invalid because it was given at 3:00 a.m. when he was "in a condition of less than full awareness." *Whitmore v. State*, 296 Ark. at 311, 756 S.W.2d at 892; Petitioner's brief in support of direct appeal to the Arkansas Supreme Court, at 144 (Respondent's exhibit A–1). In order to obtain federal habeas review, the petitioner should

present the same factual arguments and legal theories in both the state and federal claims. *Kenley v. Armontrout,* 937 F.2d 1298, 1302 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). This means that the federal claim should not present significant additional facts such that the claim was not fairly presented to the state court. *Id.* (citing *Stranghoener v. Black,* 720 F.2d 1005, 1007–08 (8th Cir.1983)). Here, petitioner's argument concerning his mental capacity and use of prescription drugs as raised in this petition is such a significant departure from the issue raised in state court that it cannot be considered to have been fairly presented to the state court.

██ Even if petitioner had raised this same issue in the state court, he would not be entitled to habeas relief as his argument is conjectural and not supported by the record. The F.B.I. agent who administered the first set of warnings testified that he has on numerous occasions observed people who were under the influence of narcotics, alcohol, or other substances, and that petitioner did not exhibit any of those characteristics (Tr. 237–41, 249). With respect to the second set of warnings, Sergeant Welch testified that petitioner seemed alert and his response to the questions was very quick (Tr. 261, 286, 993). He noted that petitioner requested and was furnished with cigarettes before reading him his rights, and that petitioner did not show any signs of intoxication or having ingested other substances (Tr. 307, 262, 285). In addition, petitioner's statement of September 28, 1986, shows that he carried on a normal conversation throughout the interview, did not indicate a desire to terminate the questioning, demonstrated an uncanny ability for recalling details and, as previously noted, was clear in acknowledging that he had been advised of his rights (Tr. 326–34, 1027–45).[18]

In sum, having considered petitioner's knowledge and conduct, the time that had elapsed since the last warnings were given, his mental condition, and other relevant circumstances, the Court finds that petitioner fully understood his *Miranda* rights and voluntarily, knowingly, and intelligently chose to waive them.[19] *Cf. Biddy v. Diamond,* 516 F.2d 118 (5th Cir.1975) (no reiteration of *Miranda* rights that were given twelve days previously required when suspect indicated she still understood her rights), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 194 (1976); *Martin v. Wainwright,* 770 F.2d 918, 930–31 (11th Cir.1985) (no reiteration of *Miranda* rights that were given seven days previously required when suspect indicated he still understood his rights), *modified on other grounds,* 781 F.2d 185, *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986); *United States v. Caldwell,* 954 F.2d 496 (8th Cir.1992) (valid waiver of *Miranda*

18. To the extent petitioner is merely arguing his statements were involuntary as a result of his mental condition, the Supreme Court held in *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986), that coercive police activity is a necessary predicate to finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. The Court noted that while a defendant's mental condition may be a significant factor in the "voluntariness" calculus, that fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness." *Id.* at 164, 107 S.Ct. at 520. Thus, absent proof of coercion brought to bear on the defendant by the state, the personal characteristics of a defendant, such as minimal formal education, history of alcohol and drug abuse, and suicide attempts, are "constitutionally irrelevant." *United States v. Rohrbach,* 813 F.2d 142, 144 (8th Cir.) (citing *Colorado v. Connelly,* 479 U.S. at 167, 107 S.Ct. at 521–22), *cert. denied,*

482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987). *See also Winfrey v. Wyrick,* 836 F.2d 406, 411 (8th Cir.1987), *cert. denied,* 488 U.S. 833, 109 S.Ct. 91, 102 L.Ed.2d 67 (1988); *Evans v. Dowd, supra,* 932 F.2d at 741–42. The Court has carefully examined the record and does not find repeated and prolonged questioning, deceit, physical punishment, threats, undue influence, or any other conduct on the part of the officers that could be characterized as overbearing or coercive.

19. Petitioner additionally argues the *Miranda* warning given by the F.B.I. agent was based upon a federal flight warrant and, thus, cannot be used as a basis for allowing subsequent statements into evidence (Petitioner's Pre–Trial Brief, at 17–18). However, "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Colorado v. Spring,* 479 U.S. at 577, 107 S.Ct. at 859.

rights when defendant was inexperienced, upset, and nervous); *United States v. Casal,* 915 F.2d 1225, 1228 (8th Cir.1990) (confession not rendered involuntary under due process clause despite asserted lack of sleep for five days and ingestion of methamphetamines), *cert. denied,* 499 U.S. 941, 111 S.Ct. 1400, 113 L.Ed.2d 455 (1991).

### B.

Petitioner argues he was denied his rights under the Eighth and Fourteenth Amendments by the trial court's submission and the jury's consideration of evidence concerning his prior conviction for attempted robbery in California. He argues that the State failed to establish a proper foundation for the admissibility of this conviction, and that this conviction was introduced into evidence in violation of Rule 609 of the Arkansas Rules of Evidence.

 Petitioner is not entitled to relief on this point since questions relating to the admissibility of evidence are matters of state law and generally are not cognizable in an action for habeas corpus. *Wood v. Lockhart,* 809 F.2d 457, 459–60 (8th Cir.1987). In order for an evidentiary error to give rise to habeas relief, the error complained of must be such that it "fatally infected the trial and failed to afford petitioner the fundamental fairness which is the essence of due process." *Id.* *See also McCafferty v. Leapley,* 944 F.2d 445, 453 (8th Cir.1991) ("[a]n evidentiary error violates a defendant's due process rights only when the error complained of is so gross, conspicuously prejudicial, or otherwise of such magnitude that it fatally infects the trial"), *cert. denied,* —— U.S. ——, 112 S.Ct. 1277, 117 L.Ed.2d 503 (1992).

The Arkansas Supreme Court reasoned as follows in concluding that petitioner's prior conviction for attempted robbery was admissible:

A.R.E. Rule 609 prevents the use of prior convictions more than 10 years old for impeachment purposes. It is based upon the concept that a crime committed more than 10 years ago is no longer probative of a witness's truthfulness at the time of trial.

On the other hand, the aggravating circumstances statute Ark.Code Ann. § 5–4–604 (1987), is not concerned with the defendant's character at the time of trial, for the jury already knows the defendant has just recently committed a murder. Instead, this statute is concerned with disclosing whether the defendant's history establishes such a propensity for violence that it will reoccur. Once the jury knows about a defendant's past propensity for violence, it can weigh that against any mitigating circumstances. In striking this balance the jury determines if the defendant has such a marked propensity for violence that it would likely manifest itself again in the future. If the jury determines beyond a reasonable doubt that the defendant will strike again, it may sentence him to death. Given the special perspective of a jury in the sentencing phase of a capital trial, a twenty-three-year-old violent felony conviction is highly relevant. Therefore, A.R.E. Rule 609 does not prevent the introduction of felony convictions more than 10 years old to show a propensity to violence in the penalty phase. (citation omitted).

*Whitmore v. State,* 296 Ark. at 316, 756 S.W.2d at 894–95. *See also Hill v. State, supra,* 289 Ark. at 396, 713 S.W.2d at 237.

The interpretation of state law is a matter for the state courts, *Hill v. Lockhart, supra,* 927 F.2d at 343, and there is nothing in the ruling of either the trial court or the Arkansas Supreme Court that could be considered a due process violation.[20]

---

20. Petitioner also argues his conviction for attempted robbery was uncounseled and may not be used, and that under California law, attempted robbery did not constitute a felony necessarily requiring the use or threat of violence or the creation of a substantial risk of death or serious physical injury to another (Petitioner's Pre–Trial Brief, at 22). Petitioner's argument is without merit on both counts. Although the issue relat-

ing to counsel does not appear to have been raised in the state courts, even if the issue is not procedurally defaulted, there is evidence in the record which indicates petitioner was represented on the attempted robbery charge by William Lundgren, a deputy public defender in the State of California (Tr. 383; Police file, 688). In addition, as correctly found by the Arkansas Supreme Court, attempted robbery in California is a crime

## VI.

█ Finally, petitioner contends he is presently mentally incompetent and that his execution would therefore violate the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishment. Certainly under *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), "someone who is 'unaware of the punishment they are about to suffer and why they are to suffer it' cannot be executed." *Penry v. Lynaugh*, 492 U.S. 302, 333, 109 S.Ct. 2934, 2954, 106 L.Ed.2d 256 (1989) (quoting *Ford*, 477 U.S. at 422, 106 S.Ct. at 2608 (Powell, J., concurring in part and concurring in judgment)). *See also Smith v. Armontrout*, 857 F.2d 1228, 1230 (8th Cir.1988) (per curiam) (it is a violation of the Eighth Amendment to execute someone who lacks the capacity to understand the nature and purpose of the punishment that is about to be imposed upon him). The Court must therefore examine two factors in assessing petitioner's competency to be executed: (1) whether petitioner understands that he is to be punished by execution; and (2) whether petitioner understands why he is being punished. *Rector v. Clark*, 923 F.2d 570, 572 (8th Cir.) (citing *Ford*, 477 U.S. 399, 106 S.Ct. 2595), *cert. denied*, —— U.S. ——, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991). Having carefully reviewed the record, the Court concludes petitioner is competent to be executed.

Petitioner first underwent a competency evaluation at the United States Medical Center for Federal Prisoners in Springfield, Missouri. In the final forensic report issued September 9, 1991, the examining doctor, Dr. Christina Pietz, found as follows:

> Mr. Whitmore was aware that he had been convicted of Capital Murder and was sentenced to be executed by the State of Arkansas. He stated, "They are going to execute me with liquid injection. They think I killed that woman so they are going to execute me. That's what Arkansas wants to do." Mr. Whitmore had no difficulty relating the events of his trial

and stated, "The jury found me guilty and decided I deserved the liquid injection." Although he presented conflicting stories as to his version of the offense, Mr. Whitmore was quite aware that he had been convicted of Capital Murder.

> \* \* \* \* \* \*

> There was no indication from Mr. Whitmore's discussion of his conviction suggesting he was confused or unable to understand the reasoning for this sentence. Another example of Mr. Whitmore's awareness of his current predicament were his threats that he would kill a staff member to postpone his execution. This suggested that Mr. Whitmore was aware of the graveness of his situation and possible alternatives to postpone his execution. Furthermore, based on this evaluation, there was no reason to believe that Mr. Whitmore suffers from a major mental illness or has ever suffered from a mental illness that would preclude him from understanding his current predicament.

> In the opinion of the undersigned examiner, Mr. Whitmore is presently competent to be executed. It is my opinion that no mental disease or defect prevents Mr. Whitmore from understanding the nature and consequences of his recent conviction of Capital Murder and is capable of relating the crime for which he was convicted with the sentence that was imposed on him by the State of Arkansas.

(Respondent's Exhibit 9). Dr. Pietz repeated these conclusions at the habeas hearing. She testified that petitioner was faking and exaggerating symptoms in order to avoid imminent execution, and that he made references that he was going to kill a staff member in order to avoid execution (H.Tr. 271, 274, 301–02, 309, 311). Dr. Pietz found nothing organically wrong with petitioner (H.Tr. 317).

In addition, Dr. Tom Jackson performed a complete neuropsychological assessment of

---

of violence, and the fact that the judgment of conviction recites that petitioner was not armed with a dangerous weapon related to whether enhanced punishment should be applied and not whether fear or force was used. *Whitmore v.*

*State*, 296 Ark. at 314, 756 S.W.2d at 893–94 (citations omitted). In that respect, petitioner admitted he hit an individual over the head with a sixteen ounce Coca Cola bottle in the course of the attempted robbery (Tr. 1198).

petitioner on February 7, 1992. In this assessment, petitioner was clinically interviewed. Petitioner was additionally administered the Wechsler Adult Intelligence Scale–Revised (WAIS–R), portions of the Wechsler Memory Scale–Revised (WMS–R), and several subtests of the Halstead Reitan Neuropsychological Test Battery (HRNB). On several occasions throughout the assessment, specific evaluations of the referral questions pertaining to death by execution were made.[21] Dr. Jackson found that not only did petitioner understand he had been sentenced to death and the reasons for that sentence, but that he was without significant neuropsychological impairment. Dr. Jackson concluded as follows:

> Mr. Jonas H. Whitmore is seen as clearly comprehending the construct of execution. Further he is able to accurately articulate his knowledge regarding his sentence of execution and the reasons for it. All test results, behavioral observations, and interview data are entirely consistent with his accurate and comprehensive understanding of the aforementioned concepts and facts. With regard to neuropsychological functioning, Mr. Whitmore's performance is not viewed as being reflective of serious neuropsychological impairment. Rather, his "mild impairment" on several subtests is consistent with his measured Low Average intelligence. There are no clear indications of significant neuropsychological impairment in Mr. Whitmore's test results, behavioral repertoire, or presentation style.

(Neuropsychological Evaluation, February 7, 1992). Dr. Jackson repeated these conclusions at the supplemental habeas hearing held on May 28, 1992. He noted that petitioner understood "execution" to mean the end of life and being put to death, and that petitioner realized he had been sentenced to death "[b]ecause of what I did," and because "[t]hey say I killed a woman" (S.H.Tr. 11–12, 33–34). Dr. Jackson further testified that he found no clear significant signs of neuropsychological impairment that would prohibit pe-

titioner's understanding that he is to be punished by execution and why he is being punished (S.H.Tr. 13, 17, 43). He noted that petitioner scored in the low-average range of general intellectual functioning on the WAIS–R, which would allow petitioner to understand the nature of execution, and that petitioner's performance on several subtests of the WMS–R indicated that his verbal memory was at least average (S.H.Tr. 13–15). While petitioner's performance on several subtests of the HRNB was in the mildly impaired range, Dr. Jackson explained that such performance was entirely consistent with his low-average intellectual function and did not indicate any significant or severe neuropsychological deficits (S.H.Tr. 16–17, 29–30, 43).

Only petitioner's witness, Dr. Patrick Caffey, a clinical psychologist in private practice, testified that petitioner does not know he is going to be executed (H.Tr. 231–33). Dr. Caffey's testimony provides no basis for concluding petitioner is not competent to be executed, however, as he was not able to point to any lack of mental awareness. Dr. Caffey specifically testified that petitioner's reality testing seemed to be all right; that petitioner is aware of what is going on; and that petitioner knows he has been convicted and sentenced (H.Tr. 175, 195, 231). Dr. Caffey further noted that petitioner exhibited better than borderline intellectual ability, and he acknowledged that petitioner realizes there is a "possibility" he will be executed (H.Tr. 221, 227).

While it may be true that petitioner is not completely free of neuropsychological impairments, "[a] condemned inmate's mental faculties need not be unimpaired for the inmate to be declared fit for execution. Mental impairments exist in sufficiently varying degrees that an inmate may be brain damaged and still possess 'the mental awareness required by the [e]ighth [a]mendment as a prerequisite to [the inmate's] execution.'" *Shaw v. Armontrout,* 900 F.2d 123, 124 (8th Cir.1990) (quoting *Ford,* 477 U.S. at 419, 106 S.Ct. at

---

**21.** By Order filed January 22, 1992, the Court directed Dr. Jackson to perform a complete neuropsychological assessment of petitioner. As part of his assessment, Dr. Jackson was directed

to determine (1) whether petitioner understands that he is to be punished by execution; and (2) whether petitioner understands why he is being punished.

2606 (Powell, J., concurring)). *Cf. Rector v. Clark*, 923 F.2d at 571 (frontal lobotomy resulting from self-inflicted gunshot wound). Nothing in the record reveals any neuropsychological impairments that would interfere with petitioner's ability to understand the nature and purpose for the punishment that is about to be imposed upon him. The Court therefore rejects petitioner's claim of incompetency.

### VII.

For the foregoing reasons, the Court finds each of the grounds advanced by petitioner in support of his petition for writ of habeas corpus to be without merit.

IT IS THEREFORE ORDERED that petitioner Jonas H. Whitmore's petition for writ of habeas corpus be, and it hereby is, denied.

IT IS FURTHER ORDERED that the stay of execution entered herein on June 28, 1989, be, and it hereby is, dissolved.