**Jonas H. WHITMORE, Appellant,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Correction, Appellee.**

No. 92–3307.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1993.

Decided Oct. 25, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 13, 1993.*

* Judge Morris Sheppard Arnold took no part in the consideration or decision of this case.

615

Gerald Allen Coleman, West Memphis, AR, argued (Therese H. Green, Memphis, TN, and Didi Sallings, Little Rock, AR, on the brief), for appellant.

Pamela Rumpz, Asst. Atty. Gen., Little Rock, AR, argued (Kyle R. Wilson, Asst. Atty. Gen., on the brief), for appellee.

Before JOHN R. GIBSON, LOKEN, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

Jonas H. Whitmore was convicted in Arkansas state court of capital murder in the death of a sixty-two-year-old woman, Essie Mae Black, committed on August 14, 1986. Whitmore was sentenced by the jury to death by lethal injection. The Arkansas Supreme Court affirmed his conviction and his sentence on direct appeal, *Whitmore v. State,* 296 Ark. 308, 756 S.W.2d 890 (1988). The state supreme court also denied his request to proceed under Rule 37 of the Arkansas Rules of Criminal Procedure. *Whitmore v. State,* 299 Ark. 55, 771 S.W.2d 266 (1989). Whitmore then filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, which was denied by the district court, 834 F.Supp. 1105.[1] He appeals. We affirm.

1. The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

## I.

Whitmore testified at trial that on August 14, 1986, he was looking for property to rent in Mount Ida, Arkansas, and stopped at the house of Clara Stanley to ask her about rental property. Mrs. Stanley, who lives approximately a mile or two from the victim, testified likewise and added that it was at approximately 2:45 p.m. that day when Whitmore came up to the fence surrounding her yard to speak with her.

Whitmore testified that he then went to Mrs. Black's house to ask about rental property. She invited him inside and made phone calls for him regarding rental property. He remembered seeing a blue billfold and a white purse. Whitmore testified that Mrs. Black resembled his mother and that he had a "flashback." He explained that both his mother and his aunt, Theomae Throne (whom Whitmore referred to as "Aunt Kiki"), had sexually abused him as a child and that certain events would trigger flashbacks of that abuse. Whitmore remembered his hand moving "up and down" as he told Mrs. Black, "don't mom, don't," and he remembered walking to the car with blood all over him. A neighbor testified that a car resembling Whitmore's vehicle left the victim's home at approximately 3:35 p.m.

Mrs. Black was found dead with at least six stab wounds in her front and three in her back (some of which were to depths of nine and a half inches), with her throat cut, and with an "X" carved into the right side of her face. One hundred and fifty dollars was missing from her purse and one hundred and twenty-six dollars was missing from a kitchen drawer.

Whitmore testified that he then drove down the highway following a car driven by another woman. He testified that when that car turned off the highway onto another road, he did also. Whitmore stated that he passed the woman on that road, but then stopped and motioned for her to pass him. Mrs. Johnson was the driver of the other car and she testified to the same facts. Whitmore testified that he stopped because he wanted to pull off the road and go into a wooded area to discard his bloody clothing. Whitmore stated that he tore out the labels from his suit and then left the suit behind a tree. He testified that he washed his hands and tried to wash the blood off the knife he was carrying with him. Unable to clean the knife, Whitmore stated that he threw the knife away. Whitmore's clothing and a knife stained with blood of the same type as the victim's were found in the wooded area. The labels had been removed from the clothes but were found in the same general area. From the labels, the suit was traced to Montgomery, Alabama, where eyewitnesses testified that the suit had been donated to Whitmore. Whitmore testified likewise. Whitmore testified that he purchased a "fancy card" for his wife and a carton of cigarettes with a one-hundred-dollar bill and that he later purchased gas with another one-hundred-dollar bill. Evidence was presented that Whitmore had given three detailed statements to the police similar to the testimony he gave at trial.

On appeal, Whitmore raises the same four general issues that he raised in his 28 U.S.C. § 2254 petition for writ of habeas corpus, which the district court denied in a thorough 51–page opinion. First, he claims that he was denied effective assistance of counsel. Second, Whitmore argues that the Arkansas death penalty scheme is unconstitutional on numerous grounds. Third, he argues that the state trial court improperly admitted evidence of statements made by him obtained in an unconstitutional manner and of a prior conviction for attempted robbery. Finally, Whitmore asserts he is mentally incompetent and, therefore, may not be executed.

## II.

Whitmore first argues that he received ineffective assistance of trial counsel by the two attorneys, Gordon Lee Humphrey, Jr., and Neal Kirkpatrick, who represented him. There are "two components to any ineffective assistance claim: (1) deficient performance and (2) prejudice." *Lockhart v. Fretwell*, —— U.S. ——, ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993). Whitmore must show that his attorneys' "representation fell below an objective standard of reasonableness" and that "there is a reasonable proba-

bility that, but for counsel['s] unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). An ineffective assistance of counsel claim presents a mixed question of law and fact; we review the district court's factual findings for clear error and its legal conclusions de novo. *Wilkins v. Iowa,* 957 F.2d 537, 540 (8th Cir. 1992).

### A.

■ Whitmore argues that counsel were ineffective at the penalty phase for failing to introduce evidence of his psychiatric disorder and insanity. The district court rejected this argument. We agree.

During a prior period of incarceration in California, Whitmore had undergone several mental status examinations and those reports were available to his counsel. In addition, his lawyers arranged to have Whitmore examined at the state hospital and by an independent, privately-retained psychologist as well.

Whitmore's attorneys decided against presenting Whitmore's mental evaluations to prove insanity, because the evaluations indicated that Whitmore did not lack "the capacity to understand the nature and the purpose of the punishment about to be imposed upon him," *see Smith v. Armontrout,* 857 F.2d 1228, 1230 (8th Cir.1988) (setting forth this two-part test derived from *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)), and, therefore, was competent to be executed. Reports from both current evaluations indicated that Whitmore had an antisocial personality disorder but was not psychotic, insane, "or any other legally substantial basis to make a specific defense on his part either in the guilt phase or in the penalty phase." (*See* Transcript of Habeas Hearing (Tr. H.H.) at 31.) Dr. Chambers, the independent examiner, indicated informally to Mr. Kirkpatrick "that in his opinion, that if Whitmore was released, he probably would do it again." (*See id.* at 377.)

The district court found that the lawyers chose not to introduce evidence of any of the mental examinations for appropriate tactical reasons. "[T]he decision not to present evidence at the penalty phase is well within the range of practical choices that are not to be second-guessed, as long as they are based on informed and reasoned judgment." *Laws v. Armontrout,* 863 F.2d 1377, 1382–83 (8th Cir. 1988) (en banc), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989). Whitmore's attorneys decided against presenting his previous mental evaluations to avoid questions on cross-examination that would reveal that the evaluations were conducted in response to his violent and bizarre behavior while incarcerated on another felony charge. (*See* Tr. H.H. at 33 (Whitmore "was accused of striking this one or stabbing that one" in prison); *id.* at 376 (Whitmore "had mutilated himself on occasion").) The attorneys believed that evidence of this behavior "wouldn't wash with a western Arkansas jury." (*Id.* at 32.) We have previously found that similar tactical decisions do not constitute ineffective assistance of counsel. *Laws v. Armontrout,* 863 F.2d 1377 (8th Cir.1988) (en banc).

> Counsel could easily have concluded that the decision to present psychological testimony would have disastrous consequences. Skillful cross-examination could have revealed that although [the defendant] suffered from no mental impairment that would negate responsibility for the murders he had committed, he was nonetheless a maladjusted man with a propensity for violence.... Such cross-examination could have alienated the jury against his client.

*Id.* at 1389. As we stated in *Smith v. Armontrout,* 888 F.2d 530 (8th Cir.1989), counsel were not ineffective for not introducing documents that may have, at best, brought some "support for the diagnosis, while also carrying a substantial risk of playing into the hands of the State's argument that [Whitmore] was a depraved and dangerous man who would not be deterred by mere imprisonment." *Id.* at 535.

Whitmore's counsel did present some evidence of "extreme mental or emotional dis-

turbance." Mitigating circumstances in the determination of the imposition of the death penalty include whether "[t]he capital murder was committed while the defendant was under extreme mental or emotional disturbance." Ark.Code Ann. § 5–4–605(1). Whitmore's main argument was that when he was with the victim he experienced a "flashback" of his mother. (Trial Transcript (Tr.) at 1066–69, 1116.) Whitmore testified that his mother and Aunt Kiki sexually abused him as a child and that certain events would trigger flashbacks of that abuse. (*Id.* at 1066–69.) Whitmore testified that the victim resembled his mother and caused him to have a flashback. (*Id.* at 1062–64, 1116.) Whitmore remembers his hand moving "up and down" as he told the victim "don't mom, don't," and remembers walking to the car with blood all over him. (*Id.* at 1070, 1114–17, 1143.) In addition, counsel elicited testimony from Whitmore concerning medical problems he was having, the medication he was taking for those problems, and his mental state both on and off the medication. (*Id.* at 1054–58.)

On the jury's penalty verdict form, the jury was presented the option of finding mitigating circumstances, including (1) that the murder was committed while Whitmore was under "extreme mental or emotional disturbance"; (2) that the murder was committed while he was under "unusual pressures or influences"; (3) that the murder was committed while his capacity "to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect"; or (4) any other factor that the jury specified in writing. We agree with the district court that the evidence was presented and "the jury simply rejected it." *Whitmore v. Lockhart,* 834 F.Supp. 1105, 1111 n. 7 (E.D.Ark.1993). Counsel were not constitutionally ineffective on this ground.

### B.

Whitmore argues that his counsel were ineffective at the penalty phase of his trial for failing to conduct an investigation of witnesses who could have presented testimony of a separate mitigating circumstance:

the physical abuse of him as a child by his father. At the habeas hearing, Whitmore submitted evidence that Aunt Kiki, her husband Leonard Junior Throne, and their two sons, Tom and Darrell Throne, would have testified to the "vicious, violent, and prolonged physical abuse [Whitmore] suffered from his father." *Whitmore,* at 1112. Attorneys Humphrey and Kirkpatrick did not interview the Thrones in preparation for the penalty phase of the trial. Whether counsel were ineffective for failing to investigate these witnesses presents a close question. To answer it, we "must determine whether [counsel's] performance in evaluating the mitigating evidence available to [them], and in deciding not to pursue further mitigating evidence, undermines [our] confidence in the adversarial process of this case." *Burger v. Kemp,* 483 U.S. 776, 788, 107 S.Ct. 3114, 3122, 97 L.Ed.2d 638 (1987).

### 1.

We first turn to the question of whether counsel's performance was deficient. Whitmore must show that his attorneys' "representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064. "A fair assessment of attorney performance requires every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. at 2065. "An attorney's decisions on what to investigate are accorded heavy deference." *Russell v. Jones,* 886 F.2d 149, 152 (8th Cir.1989) (citing *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066).

Whitmore argues that counsel's failure to investigate Aunt Kiki or her family as potential witnesses was unreasonable. "The decision to interview a potential witness is not a decision related to trial strategy. Rather, it is a decision related to adequate preparation for trial." *Chambers v. Armontrout,* 907 F.2d 825, 828 (8th Cir.) (en banc), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990). Counsel had "a duty to make reasonable investigations or to make a reasonable decision that makes particular in-

vestigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. We must determine "whether [counsel's] decision not to interview [the witness] was reasonable from counsel['s] perspective at the time that decision was made." *Chambers*, 907 F.2d at 828.

Whitmore's attorneys testified at the habeas hearing about their circumstances in preparing for trial five years earlier. They reviewed Whitmore's case file, his prison records, his mental evaluations, the physical evidence, and the actual locations involved. (Tr. H.H. at 360–62, 370–73.) As discussed above, the reports from the mental evaluations were determined to be not helpful. With Whitmore's confessions, the physical evidence, and the extensive corroborating testimony, the attorneys correctly perceived the case against Whitmore as extremely strong and an acquittal very unlikely. (*Id.* at 23–25, 36, 84, 381–82.) They prepared, however, for the "fifty or sixty" potential witnesses indicated by the state (*see id.* at 383), twenty-nine of which were eventually called at trial. In addition, they sought in vain for ways by which Whitmore's twenty-three-year-old attempted robbery conviction could be excluded, because it would (and did) constitute an aggravating circumstance in the penalty phase. (Tr. H.H. at 57–58); *see* Ark. Code Ann. § 5–4–604(3).

Mr. Humphrey indicated that in preparation for the trial he saw Whitmore frequently, ranging from twice a week to twice a day, and had conversations with him lasting usually anywhere from thirty minutes to two hours. (Tr. H.H. at 16, 19.) Mr. Kirkpatrick indicated that he spoke with Whitmore on approximately twenty occasions.[2] (*Id.* at 360.) The attorneys had frustrations in dealing with Whitmore. Based upon a story Whitmore told them involving a hitchhiker who Whitmore said was the actual murderer, the attorneys initiated an investigation. Whitmore later recanted the story. (*Id.* at 24–25, 372–73.) Whitmore repeatedly ignored his counsel's advice, especially by continuing to make statements to the police. (*Id.* at 15–16, 27, 66–67, 392–93.) *Whitmore*

*v. State*, 756 S.W.2d at 893 ("he constantly ignored the attorneys' advice not to talk to the police."). Furthermore, it was not until approximately three weeks before trial that Whitmore gave counsel the requested list of potential mitigation witnesses or would even talk to the attorneys about mitigation witnesses. (*See* Tr. H.H. at 39–40, 365, 383.) The penalty phase immediately followed the guilt phase of the trial, and both issues were presented to the same jury.

Whitmore's first list of possible mitigation witnesses included Whitmore's wife (listed twice on this list) and her address; his father and his address and telephone number; Alpha Newton, Betty Newton, and Judy Newton at the same address and telephone number; James Scott, identified as the Deputy Sheriff in Modesto, California; "Kiki Throne, her husband['s] name is Lernerd [sic] Throne, Tracy Calif."; Cleo Whitmore or his uncle D.D. Whitmore in Milton Freewater, Oregon; and his ex-wife in Modesto, California. (*See* Whitmore's App. at 93–94.) In light of the short time frame before trial and the volume of evidence, counsel asked Whitmore to provide better addresses and/or telephone numbers. (Tr. H.H. at 47.) The second list from Whitmore again included his wife; his father; Alpha, Betty, and Judy Newton and one other at the same address and telephone number; and James Scott. (*See* Whitmore's App. at 95.) The second list also included his two daughters with an address and a telephone number; "Bo Crow or his mother in New Diana or New Dain," Texas and a phone number; Frances or Guy Walker in Milton Freewater, Oregon; the pastor at the Methodist church and three other names of persons in Roundup, Montana; four names of persons in McLain, Mississippi; "Rev. Vicker's" of the Christian Life Center, Montgomery, Alabama; "Dale or Danuals Co" of New Diana, Texas; and a former sergeant of the sheriff's office in Modesto, California. (*Id.* at 95–96.) The second list, which did not include Aunt Kiki, contained the statement, "these are the people I want in court for me." (*Id.* at 96.)

---

**2.** In preparing for trial, the attorneys indicated that because Mr. Humphrey was located closer

to Whitmore, he had more contact with Whitmore than Mr. Kirkpatrick did.

Mr. Humphrey testified that he talked with Whitmore about every name on the lists. (Tr. H.H. at 40, 81.) Whitmore repeatedly emphasized that his wife should testify and did not stress many other people on the list. (*Id.* at 60.) His wife, however, had been identified by the state as a potential prosecution witness because she would testify that when Whitmore returned home he did not have his clothes and that she dyed his hair, he shaved his beard or mustache, and they gathered their belongings and drove to Montana. (*See id.* at 83–85, 374–75.) Even more damaging, she was going to testify that "this procedure had occurred on other occasions, that that was his normal way of getting the money, that he would get his suit out, leave town for a couple of days and come back with either money or jewelry." (*See id.* at 83.) The attorneys spoke with Whitmore's wife personally before and on the day of trial. (*Id.* at 43–44.) Finally, after a private discussion between Whitmore and his wife in chambers, he told the attorneys that he did not want them to call her as a witness against her will. (*Id.* at 44.)

The attorneys sent a letter to Whitmore's father, but did not receive a response. (*Id.* at 45, 366.) Next, they arranged to have Whitmore call his father from the jail. The first call was collect, and his father refused to accept the charges. (*Id.*) On the next call, his father told him he was not willing to help and hung up on him. (*Id.*) The attorneys had been told by another source that Whitmore's father was extremely angry with Whitmore for Whitmore's accusations of sexual abuse against his mother. (*Id.* at 45, 46, 366.)

The attorneys also wrote to Alpha Newton, but the letter was returned indicating " 'no such address' and 'left no forwarding address,' or something along those lines." (*Id.* at 42.) Mr. Humphrey believed that they unsuccessfully attempted to contact James Scott. (*Id.* at 48.) According to Whitmore, however, the only testimony that Scott could offer was that he had been a deputy sheriff, had arrested Whitmore when he was a juvenile, and had been nice to Whitmore, approximately 15 to 20 years ago. (*Id.*) Mr. Hum-

phrey testified that he thought Whitmore had contacted his daughters. (*Id.* at 53.)

Mr. Humphrey testified that he called all of those persons listed with phone numbers, but he "was not able to get anybody on the phone." (*Id.* at 46–47, 51–52.) Letters were sent to all of those with addresses but no responses were received. (*Id.* at 47.) They did not contact any of the people in Roundup, Montana, with the possible exception of Sharon Ewen, because they knew that Whitmore had been there for just a few weeks after the murder and before his subsequent arrest. (*Id.* at 55–56.) Others on the list were not contacted because Whitmore indicated that either they had not seen him in a number of years or that they were people that he had "only met briefly and had no real substantial knowledge of a relationship with, either met them in a bar or similar situation like that." (*Id.* at 54.) Also factoring into the attorneys' decision on how to best spend their time was the fact that Whitmore's statements and memory had been proven to be somewhat unreliable. (*Id.* at 58.) Furthermore, if no address was given or only a city and state was given, then those people were generally not contacted. (*Id.*)

Aunt Kiki and her husband were among those on the first list who were not contacted. The attorneys did not remember the specific reason for not contacting them, but both indicated that they thought it was probably because an incomplete address was given and because she was the aunt whom Whitmore accused of perpetrating the sexual abuse. (*Id.* at 48–51, 378, 385–89.) Mr. Humphrey stated that he would have been shocked if Aunt Kiki would have traveled from California to Arkansas on behalf of Whitmore to be inevitably accused of sexually assaulting him as a seven- or eight-year-old child. (*Id.* at 50.) Mr. Kirkpatrick testified that Whitmore gave them no indication that Aunt Kiki would offer anything more than a denial of the sexual abuse and perhaps that she knew him as a kid. (*Id.* at 395–96.) Although the attorneys spoke with Whitmore about Aunt Kiki (*id.* at 50, 371, 385), Whitmore had given no indication that Whitmore's father allegedly abused him as a child or that Aunt Kiki or her family had knowl-

edge of the alleged abuse. (*Id.* at 77–78, 80, 371, 377, 385, 395.) In addition, the mental reports they examined had no mention of any abuse by his father. (*Id.* at 81, 390.) Kirkpatrick recalled that one report indicated that he had "a very good relationship with his family" but another report indicated that he had "trouble with his parents." (*Id.* at 376.)

This is not a case in which counsel failed to conduct any investigation into mitigating circumstances. *Wilkins*, 957 F.2d at 541 (citing *Thomas v. Lockhart*, 738 F.2d 304 (8th Cir. 1984) (counsel's investigation deficient where he did nothing beyond reading police file)); *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir.) (citing *Chambers*, *Thomas*, and *Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir.1983)), *cert. denied*, —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). Counsel did attempt to contact all the witnesses for which either an address or phone number had been given and made special efforts in contacting Whitmore's wife and father. The attorneys were entirely unaware of the possibility of evidence that Whitmore had been abused by his father as a child. *Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir.), *cert. denied*, 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 201 (1989) (counsel not ineffective for failing to interview witness whom she "had little reason to believe would be useful or helpful"); *Cox v. Wyrick*, 642 F.2d 222, 226 (8th Cir.), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3013, 69 L.Ed.2d 394 (1981) (no ineffective assistance of counsel where the record fails to indicate that counsel had information of alibi witnesses); *cf. Kenley*, 937 F.2d at 1306 (counsel should have been aware of evidence of mitigating circumstances because it was "clearly documented in one or more places in the information [counsel] considered"); *Chambers*, 907 F.2d at 828–33 (counsel was ineffective for failing to interview and call at retrial an eyewitness whose testimony at first trial formed the basis of the defendant's sole defense to the charges). The information that Whitmore furnished to the attorneys gave no indication that Aunt Kiki would lead to evidence of abuse by his father. Whitmore himself failed to tell his lawyers about that abuse. *Russell*, 886 F.2d at 152 (after repeated conversations with defendant and his family, counsel had no reason to suspect any further defenses existed and was not ineffective); *Cox*, 642 F.2d at 226 (no ineffective assistance of counsel where "no evidence that the defendant gave counsel information which would have led him reasonably to conclude that further investigation was necessary"). The Supreme Court has acknowledged that the information given by the defendant is critical in determining the reasonableness of counsel's investigatory decisions.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.... In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066 (citation omitted). Because Whitmore had consistently accused Aunt Kiki of sexually abusing him as a child, counsel had reason to believe that interviewing her would not result in mitigating information and therefore would not be a fruitful use of their time. *See id.* ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."); *Russell*, 886 F.2d at 152 (counsel not ineffective where defendant provided "only vague, largely unhelpful testimony"); *see also Kenley*, 937 F.2d at 1308 ("We will not fault a reasonable strategy not to investigate further if it is based on sound assumptions.") (citing *Pickens*).

In considering claims of ineffective assistance of counsel in cases where counsel could have made a more thorough investigation, "'[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger*, 483 U.S. at 794, 107 S.Ct. at 3125 (quoting *United States v. Cronic*, 466

U.S. 648, 665 n. 38, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984)). Therefore, although hindsight reveals it may have been helpful for the attorneys to have contacted Aunt Kiki, we cannot say that their failure to do so, when viewed from the perspective of the attorneys at the time the decision was made, was so unreasonable as to render counsel constitutionally ineffective. With the exception of interviewing Aunt Kiki, the attorneys' investigation and preparation appears to have reached all other relevant information. We conclude that the attorneys did not fail in their "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Chambers*, 907 F.2d at 828 (quoting *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066).

### 2.

The other component in an evaluation of ineffective assistance of counsel is prejudice. Unlike the deficient performance prong, evaluation of prejudice is not limited to a contemporaneous assessment, i.e., viewing the facts as of the time of counsel's conduct without the use of hindsight. *Fretwell*, —— U.S. at ——, 113 S.Ct. at 844. The "prejudice" component instead "focusses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* (citing *Strickland*). Whitmore must show more than that the attorneys' error "had some conceivable effect on the outcome of the proceeding" because "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067. In fact, "an analysis focussing solely on mere outcome determination without attention to whether the result of the proceeding was fundamentally unfair or unreliable is defective." *Fretwell*, —— U.S. at ——, 113 S.Ct. at 842.

With the investigation that the attorneys had done, they approached the penalty phase with the strategy that Whitmore committed the murder because of his emotional state while experiencing the flashback of his sexual abuse as a child, and that Whitmore now admitted his guilt and was remorseful. (Tr. H.H. at 36–37, 69–70, 75, 374.) His testimony regarding his sexual abuse as a child was uncontradicted. The attorneys also elicited testimony from Whitmore regarding his four daughters. (Tr. at 1196.) Whitmore was the only witness to testify in the penalty phase for the defense. Although Whitmore admitted his guilt, Whitmore failed to show remorse. (*Id.* at 1197; Tr. H.H. at 38, 374.)

During the penalty phase, the state presented evidence of a twenty-three-year-old conviction for attempted robbery. Whitmore's attorneys attempted to minimize it by eliciting testimony from Whitmore explaining that he was only eighteen at the time, that he had just been drafted into the United States Army and was drinking with a friend. (Tr. at 1195.) Whitmore stated that after a cab ride, he and his friend did not pay the fare, and that Whitmore hit the cabdriver over the head with a Coca Cola bottle. (*Id.* at 1195, 1198.) On cross-examination, the prosecutor asked Whitmore if it was true that he "hit the driver over the head with a sixteen ounce Royal Crown bottle and then ran?" (*Id.* at 1198.) Whitmore answered, "No sir. It was not a Royal Crown bottle. It was a Coca Cola bottle." (*Id.*) Attorney Humphrey stated it was evident at that point that Whitmore had lost favor with the jury. (Tr. H.H. at 73.) Mr. Humphrey testified "you could hear the eyes just drop in the jury box because of the situation that was involved and his apparent ... disdain for it all.... It was a smart-mouth remark—that really cost." (*Id.* at 74.) The jury found beyond a reasonable doubt that Whitmore had committed a previous felony "an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person." (Tr. at 1209A.)

During the guilt phase, the state had presented evidence that over two hundred dollars had been stolen from Mrs. Black by Whitmore and that because there was no blood on her purse or the drawer that had contained some of the money, Whitmore must have first stolen the money and then murdered her. (*See id.* at 1166.) At the penalty phase, the jury found beyond a rea-

sonable doubt that Whitmore committed the murder "for the purpose of avoiding or preventing an arrest or effecting an escape from custody." (*Id.* at 1209A.) The jury further found the two "aggravating circumstances outweigh[ed] beyond a reasonable doubt any mitigating circumstances" and that the "aggravating circumstances justif[ied] beyond a reasonable doubt a sentence of death." (*Id.*)

Whitmore now argues that the resulting sentence of death may not have been reached if Aunt Kiki had testified. He presented evidence that she would have testified that Whitmore's father severely beat Whitmore, at times even using a baseball bat, starting when he was two and a half years old and continued until he was sixteen or seventeen. *Whitmore,* 834 F.Supp. at 1112. Whitmore presented evidence that Aunt Kiki's husband and sons would have testified likewise. In a deposition, Aunt Kiki stated that Whitmore was a normal child until the beatings began. Aunt Kiki indicated that Whitmore then began to be "sneaky evil" and began to do anything "to be cruel, to hurt someone, try to hurt." (*Id.* at 23 (quoting deposition of Theomae Throne).) Aunt Kiki's husband and sons also testified at depositions to Whitmore's violent tendencies. (*Id.* at 23–24.) For example, Darrell Throne stated that he saw Whitmore "rip the head off of a kitten one time and laugh about it while he was doing it." (*Id.* at 24.)

Whitmore emphasizes that the evidence of abuse by his father as a child would have been relevant to proving a mitigating circumstance and would have been admitted. A similar argument was presented in *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

> The evidence that might have been presented would have disclosed that petitioner had an exceptionally unhappy and unstable childhood. We have no doubt that this potential testimony would have been relevant mitigating evidence that the sentencer could not have refused to consider had counsel sought to introduce it. ... It is equally clear, however, that the undisputed relevancy of this information [of defendant's "neglectful, sometimes even violent, family background"] and the trial court's

corresponding duty to allow its consideration have no bearing on the quite distinct question [of effective assistance of counsel] before us.

*Id.* at 789 & n. 7, 107 S.Ct. at 3123 & n. 7. Although the testimony of Aunt Kiki and her family would have supported a mitigating circumstance, their testimony could have negatively impacted Whitmore's case as well. First, cross-examination could have revealed Whitmore's violent behavior that the Thrones attribute to the brutal abuse of Whitmore by his father. As with the previous mental reports, such aberrant behavior may not have, in the words of Mr. Humphrey, "washed with a western Arkansas jury." (Tr. H.H. at 32.) *See Burger,* 483 U.S. at 793, 107 S.Ct. at 3125 (failing to present potential witnesses regarding defendant's troubled childhood who could have also testified to defendant's other encounters with law enforcement and to violent tendencies exhibited by defendant did not constitute ineffective assistance of counsel); *Laws,* 863 F.2d at 1389 (avoiding cross-examination revealing violent aberrant behavior was not ineffective assistance). Second and more significant, Aunt Kiki testified at the deposition that she would have denied Whitmore's allegation that she sexually abused him. Her testimony would have therefore directly contradicted and impeached Whitmore's own testimony. Mr. Kirkpatrick indicated that because of the contradictions in their respective testimonies, he probably would not have put Aunt Kiki on the stand, even knowing of her potential testimony regarding Whitmore's abuse by his father. (Tr. H.H. at 388–89.) Whitmore wanted to testify about the sexual abuse. (*Id.* at 76–77.) "He had stuck to that part of the story throughout" his statements to the police, his discussions with counsel, and his testimony at trial. (*Id.* at 77.) Presenting Aunt Kiki's denial of such abuse would have cast into doubt the sole excuse that Whitmore believed caused him to murder Black. Therefore, while Aunt Kiki's testimony would support the mitigating circumstance of the abuse by Whitmore's father, it would have tended to negate the mitigating circumstance of the alleged sexual abuse by his mother and aunt.

Given the strength of the state's case on the two aggravating circumstances and the negative aspects of Aunt Kiki's testimony, we cannot say "that there is a reasonable probability that, but for" counsel's failure to investigate and call Aunt Kiki, that the result in the penalty phase for Whitmore would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. We find that the low probability of a different sentence for Whitmore is insufficient "to undermine [our] confidence in the outcome." *Id.* Nor are we convinced that the result reached by the jury without Aunt Kiki's testimony is fundamentally unfair or unreliable.

### C.

Whitmore claims that his attorneys were ineffective during the guilt phase of his trial for questioning him about prior convictions and for failing to object to the prosecutor's questions about a prior forgery conviction. The district court rejected these claims finding them reasonable tactical decisions by counsel. We agree. *See also Whitmore,* 771 S.W.2d at 270 (forgery conviction was admissible under Arkansas Rule of Evidence 609).

### D.

Whitmore argues that his counsel were ineffective for failing to raise four alleged constitutional defects in the Arkansas death penalty scheme. The district court disagreed and found that counsel were not ineffective for failing to make these arguments because the arguments were meritless. On appeal, Whitmore first argues that the aggravating circumstance providing that the murder was committed "for the purpose of avoiding or preventing an arrest," Ark.Code Ann. § 5-4-604(5), unconstitutionally duplicates an element of the underlying felony under *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). Although *Collins* was applicable at the time of trial, it has been subsequently overruled by *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). *Perry v. Lockhart,* 871 F.2d 1384, 1393 (8th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 378, 107 L.Ed.2d 363 (1989). Therefore, counsel were not ineffec-

tive for failing to object on this basis. *Lockhart v. Fretwell,* —— U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

Whitmore next argues that the same aggravating circumstance is vague and overbroad. We agree with the district court that this language is not vague or overbroad, *see Coulter v. State,* 304 Ark. 527, 804 S.W.2d 348, 351 (finding the language was not unconstitutionally vague), *cert. denied,* —— U.S. ——, 112 S.Ct. 102, 116 L.Ed.2d 72 (1991); *Whitmore,* 771 S.W.2d at 270 (relying on *Hill v. State,* 278 Ark. 194, 644 S.W.2d 282 (1983)), and that Whitmore's attorneys were not ineffective for failing to raise that issue.

With respect to the other asserted constitutional issues which Whitmore says counsel were ineffective for not advancing, Whitmore argues that "competent trial counsel should always raise such issues, because even though an issue may not appear to be viable under the law current at the time of a criminal defendant's trial, such law is subject to change." (Appellant's Br. at 24.) We agree with the district court that Whitmore's attorneys were not ineffective for failing to raise such admittedly meritless claims.

### III.

Whitmore next argues that the Arkansas death penalty scheme is itself unconstitutional on numerous additional grounds. The district judge found all but one of these grounds to be procedurally barred. She was correct. In fact, at least three of them were raised for the very first time in pretrial briefs filed with the district court. No state court ever saw them. After thorough review, we agree with the district court and see no need to burden this opinion with a rehash of its thorough analysis.

Whitmore's one argument that is not procedurally barred is that § 5-4-604(3) of the Arkansas death penalty statute is impermissibly broad and violates due process because it allows a twenty-three-year-old conviction to be used to establish an aggravating

circumstance.[3] The district court found that the cited statute adequately narrows the class of death eligible defendants and enables the sentencer to make a principled distinction between those who deserve the death penalty and those who do not. *See Lewis v. Jeffers,* 497 U.S. 764, 774–76, 110 S.Ct. 3092, 3098–3100, 111 L.Ed.2d 606 (1990). The district court found that the application of the statute in this case did not violate the due process clause. *See Hill v. Lockhart,* 927 F.2d 340, 343–44 (8th Cir.) (rejecting challenge to same provision for vagueness and arbitrary application), *cert. denied,* — U.S. ——, 112 S.Ct. 344, 116 L.Ed.2d 283 (1991); *see also* Ark.Code Ann. § 5–4–603(a)(3) (aggravating circumstances must justify a sentence of death beyond a reasonable doubt). On appeal, Whitmore asserts the same generalized constitutional challenge but does not support his assertion with any constitutional law analysis, relying instead principally on state evidence law. We reject Whitmore's conclusory argument and agree with the district court.

## IV.

Whitmore argues that reversible error occurred when the state court admitted into evidence (1) statements made by him that were allegedly obtained in an unconstitutional manner and (2) proof of a prior conviction for attempted robbery. The district court concluded after considering all relevant circumstances that Whitmore fully understood his *Miranda*[4] rights and voluntarily, knowingly, and intelligently chose to waive them. Therefore, the district court found no error in the admission of Whitmore's statements. With respect to the issue of the state court's admission of the evidence of the attempted robbery conviction, the district court found that it was a matter of interpretation of state law appropriately left to the state, and that the state trial court and supreme court committed no constitutional due process error in

this respect. After thorough study, we agree with the district court on both evidentiary issues.

## V.

Whitmore asserted that he is mentally incompetent and, therefore, may not be executed. The district court rejected this claim, finding the record supported the conclusion that Whitmore could understand that he is to be punished by execution and that he understands why he is being punished. The district court's fact-findings on this issue are not clearly erroneous. They are supported by the considered opinions of two doctors who examined Whitmore specifically to determine his mental capacity to be executed. It was for the district court to determine which expert to credit. After reviewing the record, we find that the district court's application of the standard set forth in *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), to the present facts contains no error of law. *Rector v. Clark,* 923 F.2d 570, 573 (8th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991). Accordingly, we affirm the district court's finding that Whitmore is competent to be executed.

## VI.

In conclusion, we affirm the district court's judgment denying Whitmore's petition for habeas corpus relief for the reasons given above.

---

3. Section 5–4–604(3) provides in pertinent part as follows:

   Aggravating circumstances shall be limited to the following:

   \* \* . \* \* \* \*

   (3) The person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person.

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).